(316 P.3d 796)
No. 109,519

GLENN C. LAKE, *Appellant*, v. JESSEE TRUCKING and
CONTINENTAL WESTERN GROUP, *Appellees*.

Opinion filed December 27, 2013.

*Kala Spigarelli*, of The Spigarelli Law Firm, of Pittsburg, for appellant.

*Christopher Shepard*, of Law Offices of Watkins Calcara Chtd., of Great Bend, and *Nathan Burghart*, of Fairchild & Buck, P.A., of Lawrence, for appellees.

Before ARNOLD-BURGER, P.J., BUSER and STANDRIDGE, JJ.

BUSER, J.: This is an appeal by Glenn C. Lake of the denial of his workers compensation claim. Lake had an accident at work and then experienced increasing symptoms of back pain and arm and leg numbness. Lake's treating physicians, a neutral physician appointed by the administrative law judge (ALJ), and a physician retained by Lake, all testified that the work accident caused his injuries. A physician retained by Lake's employer, Jessee Trucking, offered no opinion because he was uncertain regarding the onset of Lake's symptoms. The ALJ heard sworn testimony from Lake describing his work accident, his symptoms, and his medical care. The ALJ determined that the work accident caused significant neurological injuries and awarded Lake compensation for his permanent total disability. Upon review, however, the Workers Compen-

sation Board (Board) rejected Lake's testimony and held that he had failed to prove the work accident had caused his neurological injuries. Lake appeals from this adverse order.

We have reviewed the record on appeal, read the parties' briefs, and listened to oral arguments. Having considered all of the evidence, including the credibility determinations made by the administrative law judge regarding Lake's testimony and the reasons given by the Board for disagreeing with those credibility determinations, we hold the Board's findings of fact in support of its conclusion to deny compensation are not supported by substantial evidence viewed in light of the record as a whole. Accordingly, we reverse the Board's order and remand with directions to reinstate the ALJ's award of compensation.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts were developed from the evidence presented to the ALJ at the workers compensation hearing on February 6, 2012.

Lake was a 39-year-old shop supervisor and mechanic for Jessee Trucking in Galena, Kansas. Jessee Trucking was owned by Rick Jessee, his younger brother Brent Jessee, and their mother. Lake had worked as a mechanic for about 20 years and had served in the Army and National Guard. He did not have any prior disabilities.

At about noon on May 16, 2008, a 600-pound, 12- to 14-foot fiberglass bedliner for a semi-truck dump trailer was delivered to Jessee Trucking. Lake unloaded the bedliner with the help of the delivery driver and a temporary employee, Jimmy Palmer, who is also Lake's nephew. Palmer pulled the bedliner from the trailer with a forklift while Lake and the delivery driver assisted.

At some point during the unloading, the bedliner caught on the trailer. Lake placed his right arm in an opening of the bedliner and attempted to move it over the obstruction. Lake testified the bedliner had "come off the forks and come down on me and put me against the back of the trailer." Lake and Palmer testified that Lake screamed upon being struck. Lake said he "twisted, put my right leg on the ground and tried to stomp out from under" the bedliner.

It was uncontroverted that the work accident occurred. As related by Lake and Palmer, Lake was obviously hurt at the accident scene and walked with difficulty. Lake thought he had "pulled a groin" because he could not lift his leg. Palmer confirmed that Lake "was dragging his legs like he had . . . I don't know if you've ever played football or not. See somebody get hit between the legs . . . and they got [*sic*] that limp to them."

Lake and Palmer testified the work accident was promptly reported to Brent, Shelly Downs (dispatcher), and Becky Beck (secretary and bookkeeper). According to Lake and Palmer, each person asked if Lake was all right, and Lake said he had just "pulled a groin." This response produced some amusement. Lake did not seek immediate medical attention.

Lake did not submit a work accident report because no forms were available at Jessee Trucking. Lake completed a blank form he had from a prior employer, but he did not submit it due to his subsequent but unrelated hospitalization. It was uncontroverted that Lake continued to work, aside from this hospitalization, until October 2, 2008.

Only 5 days after the work accident, on May 21, 2008, Lake was taken by ambulance to St. John's Regional Medical Center (St. John's) in Joplin, Missouri. He complained of black, tarry stools and being unable to rise from the toilet without passing out. Lake remained hospitalized for 3 days for treatment of gastrointestinal bleeding and "peptic ulcer disease and erosive gastritis." He received a blood transfusion and medication. Upon his release from the hospital, Lake did not return to work for a week.

The St. John's medical records are not in the record on appeal. Testimony regarding them came from Dr. Paul Stein, who examined Lake at the request of Jessee Trucking, and Dr. Edward J. Prostic, who examined Lake at the request of Lake's counsel. Both doctors reviewed the St. John's records but did not recall seeing a reference to a work injury or to a complaint by Lake of a problem with his back or extremities.

Lake and Palmer testified that Lake's difficulties continued after his return to work. Palmer said Lake "just . . . didn't look right, looked real weak. Couldn't lift nothing [*sic*] I had to [do all the]

heavy lifting. Anytime there [were] any tires to be changed or anything that was saved over for me."

Witnesses from Jessee Trucking gave a different account. Brent testified he did not learn of the work accident for 10 days to 2 weeks. According to him, Lake said he was not hurt. Brent confirmed, however, that 2 weeks after hearing about the work accident, Lake complained "about his neck or his legs and the back was hurting." Brent maintained, however, that Lake was not having noticeable difficulties at work.

Beck denied hearing about the work accident on the day it occurred, saying she only learned of it some 6 months later in October 2008. Rick testified that he noticed Lake "sometimes" having problems with his neck, back, and/or legs between the date of the work accident and October 2008. Rick also testified that he noticed Lake walking "with a limp just a little bit but it wasn't every day." Downs did not testify. Lake testified he "kept complaining" to Beck and Downs that "I still wasn't right." According to Lake, Downs told him to go to a chiropractor. Lake said he had to wait more than 2 weeks for an appointment with the chiropractor, Dr. Russell McDaniel.

On July 8, 2008, Lake saw Dr. McDaniel. At his deposition, Dr. McDaniel, who testified that he averages "probably 150 to 160 patient visits a week," could not remember treating Lake, so the doctor's medical records were the only evidence of Lake's visits. The records were three single-sheet forms, one of which was a patient information form apparently completed by Lake. To the question, "[w]hom may we thank for referring you to us," Lake wrote "Mike Lake." The patient information form did not include a question regarding the origin of the complaint or whether it was work related.

Dr. McDaniel made cursory hand-written entries on the forms based on his interview and examination of Lake. The doctor recorded: "Patient states that he has chronic low back pain. Occupation, mechanic at Jessee Trucking. States work position creates pain in low back and sacroiliac area." The forms showed that Lake had reported the pain was made worse by work, sitting, and bending over. The pain was reported as "sharp" and occasionally radi-

ated "near the buttocks area." With regard to the onset of Lake's back pain, Dr. McDaniel wrote: "[U]nknown, may be work related." At his deposition, the doctor testified that Lake had not complained of numbness or symptoms in his extremities because these complaints were not reflected in his notes. Lake saw Dr. McDaniel once more, on July 15, 2008, and the notes from that visit read: " 'Pain continuing low back-SI area, better after treatment, but still . . . has pain, especially getting up and at end of day.' "

Lake testified that at some point a neighbor referred him to Dr. Bryan Barnes. On August 26, 2008, after waiting some time for the appointment, Lake saw Dr. Barnes. Dr. Barnes' records are not in the record on appeal, nor was he deposed. Dr. Stein reviewed Dr. Barnes' records and indicated that according to Dr. Barnes: "Lake was . . . complaining of bilateral arm pain and numbness as well as low back pain, right leg pain. He reported being struck by a 600 pound dump trailer liner in May with symptomatology since the accident."

On September 3, 2008, Lake had an MRI of his lumbar spine. A report of this procedure revealed:

"Severe congenital short pedicle spinal stenosis is noted diffusely from the lower thoracic region to L5. There is a broad-based disk protrusion noted at T11-T12 causing impingement on the distal thoracic cord with a focus of abnormal signal within the thoracic cord at this level. The L1-2 level demonstrates a broad-based disk protrusion causing mild impingement on both L2 nerve roots. The L3-4 level also demonstrates a diffusely prominent annulus resulting in mild acquired stenosis. The L4-5 level demonstrates a diffusely prominent central disk protrusion causing impingement on both L5 nerve roots."

As a result of the MRI, Dr. Barnes referred Lake to a board-certified neurosurgeon, Dr. Margaret Ellen Nichols, of the NeuroSpine Institute in Joplin, Missouri, for "thoracic and lumbar stenosis, leg pain, and arm numbness."

On September 25, 2008, Lake saw Dr. Nichols and told her "his symptoms began on May 19, 2008, [sic] when he was moving a 600-pound bed liner with a forklift, the bed liner came off the forklift and pinned him between the bed liner and truck bed." Lake said that "he had immediate numbness in his right leg, down the

back of the leg to the mid lower leg, and also developed lumbar pain and numbness in both arms." Dr. Nichols did not believe the MRI of Lake's lumbar spine explained the symptoms in his upper body and arms. She ordered MRIs of Lake's cervical and thoracic spine.

On October 2, 2008, the additional MRIs were performed. The MRI of the cervical spine showed:

"There is a central and left-sided disk herniation noted at C4-5 causing impingement on the left C5 nerve root. Large central and right-sided broad-based disk herniation is noted at C5-6 causing impingement on both C6 nerve roots and moderate cord compression. Abnormal cord signal is noted in this location."

The MRI of the thoracic spine revealed: "The thoracic canal is diffusely narrowed most likely on a congenital basis. Multilevel degenerative disk disease is noted with a broad-based central disk herniation noted at T11-12. This causes mild cord compression with an area of abnormal cord signal at this level." Dr. Nichols believed Lake needed immediate surgery to relieve the pressure on his spinal cord. She testified, "[T]he sooner the pressure is taken off the spinal cord the better the chances it will have of recovering, and we worry that the neurologic deficits can worsen over time."

On October 17, 2008, Dr. Nichols performed a cervical decompression and fusion surgery with the assistance of another physician at the NeuroSpine Institute, Dr. Laurie L. Behm, who is board-certified in physical medicine and rehabilitation. Dr. Behm, in addition to assisting Dr. Nichols in surgery, provided care to patients and also prepared impairment ratings. On November 12, 2008, Dr. Nichols performed a lumbar decompressive laminectomy on Lake.

Dr. Behm saw Lake for postsurgical care, and Dr. Nichols was still seeing Lake at the time of her deposition in May 2012. Lake had only minimal improvement after the surgeries, which Dr. Nichols attributed to permanent spinal cord damage. Dr. Behm would eventually rate Lake with a 60 percent whole body impairment, especially noting his muscle weakness and spasticity.

In her report, Dr. Nichols opined: "Because [Lake] had no pain or neurologic complaints prior to the injury, I believe that the injury exacerbated preexisting cervical, thoracic, and lumbar stenosis,

and that his spinal cord disfunction is directly related to the injuries at those levels." Dr. Nichols testified at her deposition that despite Lake's "congenitally narrow spinal canal," his spinal cord was actually compressed only at the levels where Lake had "bulging discs." The doctor attributed this condition to the work accident, testifying it was "likely that the accident caused or exacerbated the herniated disc at C5-6."

Dr. Nichols arrived at the same causation opinion regarding the T11-T12 level, although she believed it was "somewhat less likely" there "because that was more of a disc protrusion than a herniation." The doctor still believed the spinal cord compression at the T11-T12 level was "either caused by" the work accident or that it had "contributed" to it. Under cross-examination, Dr. Nichols testified she would expect Lake to have had symptoms within 1 week of the work accident if it had caused the symptoms. She said more particularly that if Lake "had no neurological complaints in July [2008], then I would think it unlikely that his neurologic problems later were related to the work injury."

Dr. Behm similarly testified that Lake's work accident "caused his neurological deficits." Dr. Behm agreed on cross-examination that Lake had congenital conditions of the spine—specifically, shortened pedicles—but she mirrored Dr. Nichols' opinion by distinguishing Lake's congenital conditions from the spinal cord compression:

"You can look at a cervical canal and see how patent it is above and below the narrowing. If it's patent up here and it's patent down here, then the congenital narrowing really isn't that much. But his stenosis or narrowing was from the bulge, from the disc coming back, and that's not congenital or pre-existing for the most part. It could be if he had an injury some place else, but it's not congenital."

On November 30, 2009, Lake saw Dr. Stein, a board-certified neurosurgeon. According to Dr. Stein's report, Lake said he experienced " 'immediate' " numbness in his right arm and leg after the work accident. Lake said he reported the symptoms to Jessee Trucking and continued working the best he could. Lake said the situation continued to worsen over time until he started dragging his right leg. Lake also reported that " 'the lady in charge' " at Jessee Trucking told him " 'to go see a chiropractor.' "

Upon examination, Dr. Stein found Lake had "[n]umbness and tingling . . . in both hands, from the waist to the knee in the left lower extremity, and throughout the right lower extremity." Lake was now reporting "difficulty with both urine and bowel control." He was also using "a four-point cane for walking and balance."

Dr. Stein arrived at a diagnosis:

"Mr. Lake has a cervical myelopathy and, likely, some element of lower thoracic myelopathy. The pathology behind his spinal cord compression is multifocal; 1. A spinal canal that is congenitally narrow in several locations due to short pedicles, predisposing to spinal cord compression. 2. Degenerative disease with osteophyte formation combined with ligamentous enlargement and disk protrusion."

Dr. Stein rated Lake as having a 55 percent whole body impairment. With respect to causation, the doctor opined:

"There is a question regarding causation and the relationship of the pathology to a work incident which apparently occurred on 5/16/08. Questions arise because Mr. Lake reports . . . the immediate onset of numbness in the right lower extremity and pain after the incident at work. However, when he presented at St. John's . . . on 5/21/08 with substantial GI complaints, there was no history given or noted regarding spinal complaints such as neck or back pain or numbness in the extremities. He presented to the chiropractor on 7/8/08 with complaints of low back pain which was characterized by the chiropractor as 'chronic' and for which the patient reported an unknown onset. There was no report of the injury which apparently occurred on 5/16/08. It was not until 8/26/08, at the office of his primary care physician, that Mr. Lake reported the work incident and related it to a variety of spinal origin symptoms. I have no mechanism based on purely medical information from which to determine whether the symptomatology was causally related to the work incident. This type of symptomatology frequently comes on without the benefit of trauma. Other information might be more beneficial in making a determination such as: 1. Documentation that this work incident actually occurred. 2. Documentation that Mr. Lake reported initial symptomatology to his employer on the day of injury, as he states today. 3. Documentation as to whether Mr. Lake was having difficulty performing his work activities in the month immediately following the work incident as he indicates today. Absent such documentation, *I cannot make a statement one way or the other as to whether there is a causal relationship between the alleged work incident and the symptomatology.*" (Emphasis added.)

Counsel for Jessee Trucking prepared unsworn statements for signature by Rick, Brent, and Palmer, whose depositions had yet to be taken in the workers compensation proceedings. Rick signed his statement, which stated that he was not present at the time of

the work accident and that Lake had not reported an injury or exhibited signs of injury in the 30 days following the work accident. He further indicated that he learned of the work accident in October 2008 "when I noticed for the first time that [Lake] was limping." Later, at Rick's deposition, Lake's counsel objected to the admission of his statement "to the extent that he testified inconsistently to portions of it in today's deposition." Brent also signed his statement, which was similar to his deposition testimony.

Palmer refused to sign the statement prepared by counsel for Jessee Trucking. Palmer testified he had spoken by telephone with an assistant to counsel for Jessee Trucking. Palmer said when he received a draft of the statement, however, "it was all twisted up," so he "told her that I would not sign it." Palmer's unsigned statement is in the record. It says Lake "was walking fine" after the incident, Palmer did not hear Lake "tell Brent about the accident," and:

"I worked with [Lake] for two and a half weeks after the incident, until I left Jessee Trucking on June 2, 2008. Until I left Jessee Trucking, I spoke with [Lake] and had the opportunity to observe him on a daily basis, and he seemed fine. He didn't complain of pain or numbness in his back, neck, hands or legs. He was walking fine, he could do his job, and I didn't notice anything different about him."

Palmer testified these representations, prepared by counsel for Jessee Trucking, were not true.

Counsel for Jessee Trucking apparently provided the statements of both Rick and Brent to Dr. Stein. Dr. Stein produced a supplemental report stating: "Clearly, there is a disconnect between the above two statements and that which I was told by Mr. Lake." The doctor repeated that he could not "state, within a reasonable degree of medical probability and certainty, that an incident at work on 5/16/08 was responsible for the myelopathy and treatment related thereto."

Counsel for Lake then provided Dr. Stein with a copy of Lake's discovery deposition (which is not in the record), and the doctor produced another supplemental report. The doctor believed that "[i]n the deposition, Mr. Lake provided information very similar to that which he gave me." The doctor concluded: "I cannot rule

out a contribution from the incident of 5/16/08 but there is no definitive indication in the records to allow a causal relationship to be determined within a reasonable degree of medical probability. The cervical stenosis was preexisting and this type of symptomatology frequently occurs without trauma."

In his deposition, Dr. Stein said Lake's short pedicles and the degenerative changes in his discs preexisted the work accident, but that he could not "make a definitive statement about the disc herniation . . . ." The doctor also said the "stenosis was likely present prior to the event as it is related to . . . the congenitally narrow canal from the short pedicles and the degenerative change." Dr. Stein thought Lake's work accident did not cause his injuries if he had no symptoms for a "week or two" after the incident. The doctor opined that Lake would have experienced "some of these symptoms" within that time period.

Dr. Stein agreed, however, that if Lake's account of symptoms immediately following the work accident were credited, the accident probably caused his symptoms. Dr. Stein conceded that the test was the timing of the symptoms, not when Lake actually sought medical care. The doctor agreed he did not know whether Lake was telling the truth regarding his symptoms and did not know whether the individuals associated with Jessee Trucking were telling the truth. He stated: "I'm not saying that Mr. Lake is not telling the truth, I don't know what happened, all I can say is that he says one thing, but there is no documentation of it. That's all I can do from a medical standpoint."

When Lake continued to experience numbness and weakness in his right hand after the back surgeries, testing showed problems with the ulnar nerve in his right elbow. Dr. Nichols recommended surgery, and the ALJ referred Lake to Dr. Lynn Ketchum, a board-certified hand surgeon, for an independent medical evaluation.

On August 12, 2010, Lake recounted his medical history to Dr. Ketchum, which the doctor reported as follows:

"Mr. Lake is right-hand dominant and has problems with his right upper extremity, which he denies having prior to beginning work at Jessee Trucking . . . . He had a specific accident on May 16, 2008, when he was unloading a bedliner on a truck. Because of a forklift problem, the bedliner came down and pinned him

between the bedliner and the back of the trailer. . . . At the time of the injury his right elbow was also pinned, and when he tried to extricate himself he noticed that immediately the ulnar three digits in his right hand were numb, and that he had lost feeling in them."

On October 20, 2010, Dr. Ketchum performed a right cubital tunnel release. This surgery provided some relief to Lake, although the doctor still rated Lake at a 25 percent impairment rating of his upper right extremity "based on the diagnosis of moderate compression of the ulnar nerve at the elbow, and weakness." In his report, Dr. Ketchum opined: "[T]he prevailing factor in the cause of the right cubital tunnel syndrome was the pinning of the right elbow at the time of [Lake's] accident, on May 16, 2008."

Dr. Ketchum was questioned about his causation opinion at his deposition. He responded: "It was because [Lake], on repeated questioning, denied having any problems with that upper right extremity and that immediately upon extricating himself from . . . being pinned between the bedliner and the truck, he noticed numbness in the ulnar three digits of that right hand." During cross-examination, Dr. Ketchum agreed that Dr. Barnes' notes of August 26, 2008, appeared "to be the first reference . . . in the medical records of the right upper extremity problems." When asked whether the absence of an earlier reference would "change your opinion regarding whether the work event of May 16 was the cause of the right ulnar nerve compression," the doctor stated: "[M]y answer to that is . . . that in many instances I see when people go to a specific doctor, they go to them for their chief complaint. And that's the focus. And sometimes other complaints which are considered less troublesome are not brought up."

On October 28, 2011, Lake was examined by Dr. Prostic, a board-certified orthopedic surgeon. Lake again recounted the work accident of May 16, 2008, saying that "he recognized injury immediately but did not seek medical attention at the time." Lake made the same complaints as before but now added "absent sexual function." In his report Dr. Prostic stated that Lake had a "preexisting congenitally small spinal canal" and had also "sustained injuries to his spine during the course of his employment." The doctor assigned a 73 percent whole body impairment rating, which

included the 25 percent impairment of the upper right extremity, a consideration taken into account by Dr. Behm but not by Dr. Stein. Dr. Prostic also considered Lake's bowel and bladder incontinence in his calculation, unlike Dr. Behm who simply noted the incontinence.

In his deposition, Dr. Prostic said Lake "had sprains and strains of his spine perhaps with herniation of disc superimposed upon preexisting spinal stenosis and degenerative disc disease with development of spinal cord contusions." When asked whether Lake's delay in seeking medical attention would "cause you any concern as to whether the injuries he sustained were a result of the bedliner," the doctor said: "[V]ery commonly people with symptoms of cervical or lumbar spinal stenosis have it increase gradually rather than all of a sudden." Dr. Prostic suggested that because Lake "did not recognize a major injury to the neck or back immediately, I think it's most likely that he had some preexisting disc protrusions at both levels and that he had a worsening from the work accident on May 16, 2008." The doctor thought Lake was at "a very young age for having symptoms of spinal stenosis, and especially for having it in two separate areas," if trauma were not, in fact, a cause.

Dr. Prostic testified he would expect symptoms by early June 2008 if the work accident had caused the symptoms. He also said that if Lake "truly ha[d] no symptoms for several weeks, then it's rather hard to say that it's the work event rather than being unrelated to work." The doctor also stated that if Lake had no symptoms in his upper extremities by July 2008, "then I could change my opinion."

Lake filed his workers compensation claim on October 17, 2008. More than 3 years later, on February 6, 2012, Lake personally appeared for the workers compensation hearing to testify before the ALJ. In addition to the facts already related, Lake testified that after the work accident he could do "[s]ome" of his duties, "like ordering parts and stuff like that." Lake said he needed help, however, for the "physical parts" of his job.

Lake answered affirmatively when asked if he had reported his work injury while hospitalized at St. John's. Lake agreed that he told hospital staff his "leg and back . . . [were] hurting." Lake also

said that "[t]hey gave me pain medication for my back and my arm." Lake again answered affirmatively when asked whether he had told Dr. McDaniel about his work injury. However, Lake was not questioned on the specifics of his statements to Dr. McDaniel about his symptoms.

Describing his current condition to the ALJ, Lake testified that his right leg was numb "from the waist down" and did not function at all. Lake said he had feeling to the knee of his left leg and that it functioned partially. He complained of continuous neck pain and testified he was unable to look up or down. Lake rated his back pain at 7 on a scale of 1-10 during the hearing, saying he could "get it down to a four if I lay on the couch all day like I usually do." Lake said that after his arm surgery, "I've got three fingers back and the thumb, and the pinkie one is dead, no bend, no range of motion at all." Lake confirmed that he was receiving Social Security disability payments.

After considering all the evidence presented, including Lake's personal testimony, the ALJ found that Lake "was suffering ill effects from his injury at the time of the accident, per his testimony and that of Mr. Palmer." The ALJ further found that "the medical evidence indicates a man [Lake's] age could not have suffered injuries of the magnitude to his spine without significant trauma. The only evidence of trauma in the record is when the bed-liner [pinned] Mr. Lake against the truck trailer."

Accordingly, the ALJ held that Lake "suffered personal injury by accident which arose out of and occurred in the course of his employment with [Jessee Trucking]." With regard to the nature and extent of the disability, the ALJ noted: "Four physicians offered opinions of functional impairment. One of those, Dr. Stein . . . , wrote in his report that he could not draw a definite conclusion about the causation of [Lake's] injuries within a reasonable degree of medical certainty." Of the remaining doctors, Dr. Ketchum's rating was incorporated into the ratings by Dr. Behm and Dr. Prostic, and since Dr. Prostic had included Lake's incontinence while Dr. Behm had not, the ALJ accepted Dr. Prostic's rating. The ALJ concluded Lake had a functional impairment of 73 percent to his body as a whole, had a permanent total disability, and should be

awarded the statutory cap of $125,000 plus medical expenses and ongoing medical care.

After the ALJ's ruling, Jessee Trucking applied for review by the Board. Upon its consideration of the record, the Board found the work accident had occurred, including that Lake "attempted to free the bed liner by sticking his arm in a hole in the bed liner, picking it up and telling Mr. Palmer to back up." The Board also accepted that Lake "screamed and tried to get free by jerking his right arm out of the hole, pushing the ground with his right leg and twisting his neck and back."

The Board concluded that Lake "had an accidental injury arising out of and in the course of his employment on May 16, 2008, when he was momentarily pinned between the bed liner and trailer." The Board, however, limited this injury to a "groin strain," for which it made no award of compensation.

With regard to Lake's neurological injuries, the Board found that Lake had not told medical personnel at St. John's of his symptoms. The Board also found Dr. McDaniel's notes did not mention the work accident or "neck, upper extremity or lower extremity complaints." The Board found it "difficult to grasp why [Lake] would not have voiced complaints of arm and leg numbness and tingling to medical professionals until August 2008." The Board concluded:

"The Board finds that if [Lake] suffered a traumatic injury severe enough to cause his need for three surgeries, his diffuse complaints would have existed when he went to St. John's and when seen by Dr. McDaniel. The Board cannot conclude [Lake] simply suffered with his various neck, arm, back and leg symptoms until finally seeing his primary care physician, Dr. Barnes, on August 26, 2008. The Board finds that [Lake] failed in his burden of proving such symptoms were due to his May 16, 2008 accident, primarily based on the medical testimony that such symptoms should have been present by at least early-June 2008."

The Board reversed the ALJ's award of compensation for a permanent total disability, holding that Lake "did not meet his burden of proving any other personal injury arising out of or in the course of his employment." Lake appeals.

## Is the Board's Finding that Lake's Neurological Injuries Did Not Arise Out of His Employment Supported by Competent Evidence Viewed in Light of the Record as a Whole?

On appeal, Lake contends "the medical evidence proves [he] suffered injuries to his spinal cord and arm" from the work accident at Jessee Trucking. Lake notes the "only doctor that questions the causal connection . . . is Dr. Stein who was hired by" Jessee Trucking and that "even he could not say conclusively [that the] injuries were not related to the work accident." Jessee Trucking responds that "the Board made an implicit assessment of [Lake's] credibility based on the apparent severity of his allegedly 'immediate' onset symptoms and the substantial delay in which he opted to seek treatment for them." Jessee Trucking maintains the Board's "assessment of [Lake's] credibility was supported by substantial competent evidence in the total absence of corroborating medical documentation."

We begin our analysis with a review of relevant workers compensation statutes and caselaw. Lake is owed compensation if he suffered "personal injury by accident arising out of and in the course of employment." K.S.A. 44-501(a). The parties do not dispute that Lake was working in the course of his employment. The issue is therefore whether Lake's injuries arose out of that employment. " '[A]n injury arises "out of" employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury.' [Citations omitted.]" *Rinke v. Bank of America*, 282 Kan. 746, 752, 148 P.3d 553 (2006). "The claimant has the burden to show that an injury, disease, or condition arose out of the employment." *Chriestenson v. Russell Stover Candies*, 46 Kan. App. 2d 453, Syl. ¶ 4, 263 P.3d 821 (2011), *rev. denied* 294 Kan. 943 (2012); see K.S.A. 44-501(a).

On appeal, an appellate court's standard of review for cases brought under the Workers Compensation Act, K.S.A. 44-501 *et seq.*, is controlled by the Kansas Judicial Review Act (KJRA). See

K.S.A. 77-601 *et seq.*; K.S.A. 44-556. As an appellate court, we review the Board's factual findings to determine if those findings are supported by substantial evidence "viewed in light of the record as a whole." K.S.A. 2012 Supp. 77-621(c)(7); L. 2009, ch. 109, sec. 28; see *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 362-63, 212 P.3d 239 (2009). Jessee Trucking agrees that we review for substantial evidence. Substantial evidence is defined as that which "a reasonable person might accept as being sufficient to support a conclusion." *Herrera-Gallegos*, 42 Kan. App. 2d at 363.

" '[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, *including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness* and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." (Emphasis added.) K.S.A. 2012 Supp. 77-621(d).

Moreover, appellate courts should "examine whether the evidence supporting the Board's decision has been so undermined by other evidence that it is insufficient to support the Board's conclusion." *Olds-Carter v. Lakeshore Farms, Inc.*, 45 Kan. App. 2d 390, 395, 250 P.3d 825 (2011) (citing *Herrera-Gallegos*, 42 Kan. App. 2d at 363). We must "consider the credibility determination that the hearing officer made," and "[i]f the agency head, here the Board, does not agree with those credibility determinations, the agency should give its reasons for disagreeing." *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010), *rev. denied* 293 Kan. 1107 (2012). We will then "consider the agency's explanation as to why the relevant evidence in the record supports its material factual findings." 43 Kan. App. 2d at 837.

An analytical roadmap for appellate review in an analogous workers compensation case was provided in *Rausch v. Sears Roebuck & Co.*, 46 Kan. App. 2d 338, 341-45, 263 P.3d 194 (2011), *rev. denied* 293 Kan. 1107 (2012). In *Rausch*, the ALJ held that Rausch,

a workers compensation claimant, had met her burden of proof on causation. The Board disagreed, finding that Rausch was not credible. On appeal, our court outlined the reasons the Board gave for its credibility determination and analyzed whether they constituted "legitimate reasons for the Board to question Rausch's credibility." 46 Kan. App. 2d at 344. We will employ a similar analysis in this case by evaluating whether the individual reasons given by the Board to discount Lake's sworn testimony that he experienced symptoms of back and arm injuries during or shortly after the work accident were supported by the evidence. In this way, we will answer the central question posed by this appeal: Is the Board's finding that Lake's neurological injuries did not arise out of his employment supported by substantial evidence viewed in light of the record as a whole?

*Lake's Failure to Promptly Obtain Medical Treatment*

In its ruling, the Board emphasized that Lake's sworn testimony about his immediate neurological symptoms was incredible because he had not sought immediate medical treatment: "The symptoms [Lake] reported having immediately or shortly after his work accident would seem to be the sort of symptoms that would compel him to seek medical treatment immediately." Although the Board did not acknowledge it, this finding was predicated on a presumption—that Lake was the sort of person who would feel compelled by the onset of neurological symptoms to seek immediate medical treatment.

The Board did not identify any evidence in the record supporting this finding or the presumption upon which it was based. Considering the Board relied on this finding when disregarding the ALJ's determination of Lake's veracity, the Board's failure to identify any supporting evidence is disconcerting. Having independently reviewed the record, however, we conclude the Board's finding was not supported by any substantial evidence.

On the other hand, there was evidence to support the notion that Lake was not the sort of person inclined to promptly seek medical treatment when confronted with serious health issues. In particular, we note his delayed response to suffering from serious

gastrointestinal disorders. Instead of seeking immediate treatment, Lake ignored the symptoms until they worsened to the extent it was necessary for him to be taken by ambulance to St. John's. We could add that Dr. Nichols' report showed that Lake had an abnormally elevated and untreated blood pressure of 200/106. Lake also reported consuming a six-pack of beer daily, and said he had used five cans of chewing tobacco a week for 20 years.

Because this evidence was uncontested, the Board's finding based on a presumption leaves us with a person who disregarded his health care in other situations, yet was expected to seek immediate treatment of neurological symptoms. We do not find any evidence to support such inconsistent traits or behaviors in Lake, nor does reason or common experience suggest it. The Board's finding that Lake's claimed neurological symptoms were not credible because he did not seek immediate medical treatment was unsupported by the record, while evidence to the contrary was presented during the proceedings.

*No Mention of Work Accident or Neurological Symptoms in Selected Medical Records*

The Board also found Lake's testimony about his immediate neurological symptoms was incredible because those symptoms were not mentioned in the medical records from St. John's and Dr. McDaniel. The Board specifically found: "[T]here is no mention of the accident or [Lake's] asserted immediate symptoms in the St. John's records or in Dr. McDaniel's records." The Board thought it "troubling that [Lake] actually obtained medical treatment at St. John's in May 2008 and with Dr. McDaniel in July 2008, both on his own accord, without making mention of his accident or his diffuse symptoms."

The importance placed by the Board on the apparent absence of Lake's mention of neurological symptoms or the work accident in the St. John's records is overstated. The St. John's records were never in evidence for review. Testimony submitted to the Board regarding those records revealed next to nothing about them, including whether they typically would have included complaints unrelated to the gastrointestinal disorders for which Lake was emer-

gently admitted to the medical center. The evidence showed only that two doctors who reviewed the St. John's medical records did not recall any mention of neurological symptoms or Lake's work accident.

We conclude this testimony was not substantial evidence supporting the Board's disregard of the ALJ's determination that Lake's testimony was truthful when he stated that he noticed a range of neurological symptoms within a relatively short time after the work accident. In other words, a reasonable person would not consider the doctors' testimony about their review of the medical records sufficient by itself to support a conclusion that Lake was not experiencing neurological symptoms while being treated for serious gastrointestinal disorders at St. John's.

With regard to Dr. McDaniel's records, during Lake's testimony he was never questioned regarding any statements that he made to the doctor about the onset of his symptoms or their cause. Moreover, Dr. McDaniel had no recollection of Lake's statements because he did not even remember evaluating him. With this context, the Board relied on the doctor's cursory handwritten notes from his clinical records for evidence of Lake's statements about his medical complaints. The Board also relied on Dr. McDaniel's testimony that he would have written down other symptoms if Lake had reported them. If we consider the very high volume of Dr. McDaniel's practice and the perfunctory nature of the three pages of medical records, this evidence was hardly sufficient for the Board's finding that Lake never mentioned his work accident or his symptoms to Dr. McDaniel.

Contrary to the Board's finding, however, Dr. McDaniel recorded that Lake had sharp back pain radiating near his buttocks and that the onset of Lake's symptoms "may be work related." These entries were at least a mention, and arguably some corroboration, of Lake's testimony that his accident was work related.

For all these reasons, we find the Board's inference from the limited medical records to be overstated. Dr. McDaniel's records confirm that Lake saw the chiropractor in early July 2008. When considered together with Lake's uncontroverted testimony that he waited more than 2 weeks for this appointment, Lake was clearly

experiencing some back symptoms by June 2008—only 1 month after his work accident. The only question would be the specific type and degree of symptoms, and in this regard Dr. McDaniel's perfunctory records were simply insufficient to support the Board's disregard of the ALJ's determination of Lake's veracity.

Next, in questioning Lake's truthfulness, the Board highlighted his testimony that Downs (Jessee Trucking's dispatcher) had referred him to a chiropractor. The Board found this testimony was "not credible" because Lake "listed in [Dr. McDaniel's] patient information sheet that he was referred by 'Mike Lake.'"

Lake testified at the regular hearing:

"Q. At some point you asked to go to the doctor, correct, for your leg and arm?
"A. At some point, yes.
"Q. And it looks like from the record you first started seeing a chiropractor in July?
"A. Yes.
"Q. And that would have been—
"Q. That's who I was told to go to by [Downs]."
. . . .
"Q. . . . You told both [Downs] and [Beck] that you were still hurting?
"A. Yes.
"Q. And they suggested that you go to a chiropractor?
"A. [Downs] did."

Unlike the Board, we do not see a contradiction between Lake's testimony and Dr. McDaniel's patient information sheet. Lake's testimony was that Downs told him to see a chiropractor. While this could mean that Downs specifically referred Lake to Dr. McDaniel, Lake did not explicitly say so. Lake's testimony also could be read fairly to mean that Downs told Lake to see an unnamed chiropractor and then Mike Lake specifically referred him to Dr. McDaniel. Of course, this is all a matter of speculation because Downs never testified in the proceedings to either confirm or contradict Lake's testimony. There was simply scant and ambiguous evidence regarding the tangential issue of how Lake came to visit Dr. McDaniel. In summary, for all of the reasons stated, we conclude the St. John's and Dr. McDaniel's medical records did not provide substantial evidence to discount Lake's sworn testimony.

*Lack of a Full Range of Neurological Symptoms Shortly After the Work Accident*

On several occasions in its opinion, the Board implicitly found that if the work accident was the cause of Lake's neurological symptoms, he would have experienced the full range of these symptoms soon after his work accident.

One example is the Board's treatment of Dr. Ketchum's causation opinion, which the Board discussed in its findings of fact:

"Dr. Ketchum testified the cause of [Lake's] right cubital syndrome was the May 16, 2008 accident. . . . Dr. Ketchum testified that it was his understanding that [Lake's] right elbow problems occurred immediately as a result of the accident. He agreed the first mention of [Lake] having right upper extremity complaints was in Dr. Barnes' August 2008 report and the St. John's and chiropractic records made no such mention of right arm problems. Dr. Ketchum stated [Lake's] right elbow problems could have worsened over time if [Lake] had a contusion that caused bleeding, which in turn would cause scar tissue. However, Dr. Ketchum agreed his operative report contained no mention that scarring was ever identified."

The Board surmised that Lake's symptoms in his right arm would have occurred earlier if the work accident had caused the symptoms:

"While it is possible [Lake's] accidental injury could have caused swelling to develop slowly within [Lake's] spine, causing pressure on the spinal cord and resulting in [Lake's] arm and leg symptoms, there is no credible medical evidence to support such theory. The majority of the medical experts testified [Lake's] arm and leg symptoms should have been identifiable within a finite period of time, within a few days or by early-June 2008, not by late-August, 2008. No doctor provided a credible reason why [Lake] would have delayed onset of symptoms if the accident caused his injuries and need for emergency surgeries in late-September and mid-October 2008."

We disagree. Based on our independent review of the record, we do not find substantial evidence supporting the Board's findings. Lake testified to a gradual increase in his symptoms, and even the testimony of Rick and Brent provided some corroboration of this testimony. Dr. Ketchum testified that upper extremity symptoms like those experienced by Lake could worsen over time, and contrary to the Board's implication, he also thought his operative report was "compatible" with the existence of scar tissue. Dr.

McDaniel specifically testified it was "not uncommon" for the symptoms of a disc injury or spinal cord compression to worsen over time. Dr. Nichols testified that surgery was necessary to arrest Lake's decline, which clearly meant his symptoms were worsening over time. Dr. Stein testified that "you would certainly expect *some* of these symptoms to start reasonably soon after the incident." (Emphasis added.) Finally, Dr. Prostic testified that symptoms like Lake's "can gradually get worse and you can pick up progressively more symptoms as time goes on." In fact, Dr. Prostic testified it was "common" for symptoms to grow worse over time.

In summary, we do not find evidentiary support for what the Board called the "majority" medical opinion that Lake's "arm and leg symptoms should have been identifiable within a finite period of time, within a few days or by early-June 2008." The medical testimony was more generalized and nuanced. While substantial expert medical evidence supported a conclusion that some neurological symptoms should have been experienced within a week or two—which Lake clearly testified he experienced and Palmer testified he noticed—a majority of the doctors did not specify the symptoms they would expect within that short time frame. Considering the record as a whole, we hold there was not substantial evidence to support the Board's finding that Lake's sworn testimony that he experienced some symptoms consistent with neurological injuries within a short time after the work accident was not credible.

### CONCLUSION

There was considerable undisputed testimony proving many aspects of Lake's workers compensation claim. First, the fact that Lake was involved in a work accident on May 16, 2008, was uncontroverted. Second, Lake's and Palmer's eyewitness accounts of the manner in which the work accident occurred were also uncontested. Third, even the Board concluded that Lake had sustained an injury, albeit a minor one, during this work accident. Fourth, there was no evidence that Lake had ever sustained a neck, back, or right arm injury prior to the work accident. Fifth, on the other hand, there was no evidence of trauma to Lake's neck, back, or

right arm after the work accident and before the extent of his back condition was fully revealed in the fall of 2008 by the three MRI studies of his spine. Moreover, it was uncontroverted that Lake underwent three surgeries in an effort to alleviate his back and arm conditions. Finally, Lake's permanent total disability was apparent and well-supported by medical testimony.

The critical issue presented to the ALJ was the cause of Lake's injuries. Lake bore the burden to prove this aspect of his claim. See *Chriestenson*, 46 Kan. App. 2d 453, Syl. ¶ 4. The ALJ had the opportunity to evaluate Lake's testimony when he appeared in person under oath before the ALJ. The ALJ credited Lake's testimony, especially with regard to Lake's assertion that he sustained the serious back and arm injuries as a result of the work accident. In particular, the ALJ found that Lake "was suffering ill effects from his injury at the time of the accident, *per his testimony* and that of Mr. Palmer." (Emphasis added.)

As an appellate court, we are tasked under K.S.A. 2012 Supp. 77-621(d) with reviewing the total record, *"including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness."* (Emphasis added.) This legal imperative to carefully consider a judicial officer's personal determinations of veracity rather than formulating later credibility judgments based solely on transcripts and documentary evidence is consonant with the limited role of an appellate court generally: "One of the reasons that appellate courts do not assess witness credibility from the cold record is that the ability to observe the declarant is an important factor in determining whether he or she is being truthful." *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008).

The Board was within its rights to discount the ALJ's credibility determinations and provide reasons for its findings. See *Kotnour*, 43 Kan. App. 2d at 837. But the law requires those findings to be supported by substantial evidence in light of the record as a whole. See K.S.A. 2012 Supp. 77-612(c)(7), (d). The law does not allow the Board to discount an ALJ's credibility determinations of a claimant based on presumptions, suppositions, and cherry-picked record references of questionable or limited evidentiary value.

In the present case, the undisputed causation opinions of Drs. Nichols, Behm, Ketchum, and Prostic related Lake's neurological injuries to the work accident. Dr. Stein's uncertainty was based on a lack of documentation of Lake's testimony that he suffered immediate symptoms—not on his medical opinion that the work accident as described could not have caused the neurological injuries. We recognize the Board " 'is not bound by medical evidence presented in the case and has the responsibility of making its own determination.' " *Roskilly v. Boeing Co.*, 34 Kan. App. 2d 196, 199, 116 P.3d 38 (2005). We also recognize medical evidence is not necessary to prove causation generally. See *Webber v. Automotive Controls Corp.*, 272 Kan. 700, 705, 35 P.3d 788 (2001). Yet the Board may not "disregard undisputed evidence that is not improbable, unreasonable, or untrustworthy. Such evidence must be regarded as conclusive. [Citations omitted.]" *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 515, 154 P.3d 494 (2007).

Because the question here is not the existence of a work accident, which the Board found, or even of injury to Lake, which the Board found in the form of a pulled groin, but only of a link between the work accident and Lake's neurological injuries, the causation opinions of Drs. Nichols, Behm, Ketchum, and Prostic do not seem improbable, unreasonable, or untrustworthy. We conclude that the weight of this medical evidence, coupled with the lack of substantial evidence to uphold the Board's findings that Lake was not credible (contrary to the ALJ's determination) and the evidence corroborating Lake's testimony that he experienced neurological symptoms during and shortly after the accident, require reversal of the Board's ruling. In short, we hold the Board's findings of fact in support of its conclusion to deny compensation are not supported by substantial evidence viewed in light of the record as a whole. Accordingly, we reverse the Board's order and remand with directions to reinstate the ALJ's award of compensation.

Reversed and remanded with directions.