NOT DESIGNATED FOR PUBLICATION

No. 118,843

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TYSON R. GHERE,
*Appellant*,

v

HUTCHINSON CORRECTIONAL FACILITY,

and

STATE SELF INSURANCE FUND,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed December 14, 2018. Affirmed.

*Mitchell W. Rice*, of Mann Wyatt & Rice, of Hutchinson, for appellant.

*Jeffery R. Brewer*, of Jeffery R. Brewer, P.A., of Wichita, for appellees.

Before ARNOLD-BURGER, C.J., LEBEN and BRUNS, JJ.

PER CURIAM: Tyson Ghere appeals from a Workers Compensation Appeals Board order denying his claim that he was permanently impaired after suffering a work-related injury in 2007. Although there was medical testimony to support Ghere's claims, the Board relied on the testimony of several other physicians who said that the symptoms Ghere experienced after the incident were due to an underlying congenital disorder—not because of a work-related injury. The Board, not this court, makes the factual findings, and the Board was entitled to weigh each expert's testimony as it saw fit. So we must affirm the Board's

decision: the Board's factual conclusions that Ghere didn't suffer a work-related injury and that he wasn't permanently impaired were supported by substantial evidence.

FACTUAL AND PROCEDURAL BACKGROUND

While Tyson Ghere was working as a guard at a Kansas Department of Corrections facility in Hutchinson in July 2007, he heard a signal requiring him to respond to an emergency taking place between 20 and 40 yards away. While running to the emergency, Ghere said he "felt something wasn't right in [his] leg [and] could feel kind of a pressure." By the time he arrived to the emergency—between a minute and a minute and a half after getting up to respond—Ghere testified that his leg had swollen so much that his baggy, military-style pants were "skin tight from [his] waist clear down past [his] ankle." He reported the injury to his superior, Lieutenant Charles (whose first name doesn't appear to be in our record), who sent Ghere to "the Same Day Care." Medical personnel ordered that Ghere be off work for about a month.

When Ghere returned to work about a month later, he testified that he "still notice[d] the swelling, [and] the more [he] was up and on it, . . . the more it would swell." He described how the swelling started occurring "earlier and earlier in the day" until it "became all but impossible for [him] to perform [his] duties." The State paid Ghere from the date of the reported injury until December 2009. Then, in 2012, Ghere turned in his resignation, at which time the State stopped paying his medical insurance.

In July 2009, Ghere filed a claim requesting preliminary benefits including medical treatment and the continuation of lost-wage benefits for his injury and its effect on his "[l]eft lower extremity, back, vascular disorder and all parts affected." An administrative-law judge (ALJ) denied Ghere's request because Ghere "failed to sustain his burden of proof of personal injury by accident arising out of and in the course of his employment . . . ." The order concluded that "[Ghere] has a congenital condition that was

2

not caused by work-related duties. While he suffered an exacerbation of that pre-existing condition while at work on July 30, 2007, the greater weight of the medical evidence fails to establish that [Ghere's] pre-existing condition was aggravated or accelerated by work duties."

Ghere appealed the ALJ's decision. In 2011, the Workers Compensation Appeals Board reversed the ALJ's preliminary order denying Ghere's request. The Board remanded the claim to the ALJ "for further orders on [Ghere's] request for preliminary benefits." On remand, the ALJ found that Ghere was entitled to medical care and payment of benefits until Ghere either returned to work or was offered work within his temporary work restrictions.

In 2013, the ALJ awarded Ghere temporary-total-disability compensation and permanent-total-disability compensation in the amount of $90,817.09 for time periods that had already come and gone (making that sum due) plus an additional $34,182.91 of permanent-total-disability compensation to be paid at $510.61 per week. On appeal, the Board voided the award based on its conclusion that the ALJ hadn't considered the entire record in reaching its decision. The Board remanded Ghere's claim to the ALJ for reconsideration.

On remand, the ALJ entered a similar award that totaled $172,476.90. (The higher award, ordered in 2017, reflected a greater length of time for permanent-total-disability compensation.) The State again appealed to the Board.

The Board again reversed the ALJ's award, this time concluding that Ghere "did not prove he had sustained a left lower extremity injury by accident arising out of and in the course of his employment[, and i]f claimant did sustain such an injury, he did not prove he had a permanent functional impairment as a result of said injury." The Board

3

also found that Ghere "did not prove he sustained a back injury arising out of and in the course of his employment."

Ghere then appealed to our court.

ANALYSIS

I. *Ghere Failed to Sustain His Burden of Proving a Personal Injury Through an Aggravation, Acceleration, or Intensification of His Pre-Existing Vein Condition.*

Ghere's first argument is that the Workers Compensation Appeals Board erred by finding that Ghere didn't prove that he had sustained an injury by accident arising from his employment.

The Kansas Judicial Review Act governs this court's review of cases arising under the Workers Compensation Act. K.S.A. 2017 Supp. 44-556(a). At a hearing before the Workers Compensation Board, the claimant has the burden of proving his or her right to compensation. *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 137, 343 P.3d 114 (2015). On appeal to this court, the party claiming error has the burden to show it. K.S.A. 2017 Supp. 77-621(a)(1); *Moore*, 51 Kan. App. 2d at 137.

Whether an accident arises out of and in the course of employment entitling a claimant to compensation is a question of fact. See *Scott v. Hughes*, 294 Kan. 403, 415, 275 P.3d 890 (2012); *Rinke v. Bank of America*, 282 Kan. 746, 751, 148 P.3d 553 (2006). Our review of questions of fact is limited to whether the Board's findings of fact are supported by substantial competent evidence. K.S.A. 2017 Supp. 77-621(c)(7); *Moore*, 51 Kan. App. 2d at 137. Substantial evidence is evidence that a reasonable person would accept as sufficient to support a conclusion. *Buchanan v. JM Staffing*, 52 Kan. App. 2d 943, 948, 379 P.3d 428 (2016).

4

We cannot reweigh the evidence or make our own independent review of the facts. We simply determine, after reviewing all the evidence—including both evidence that supports the Board's findings and evidence that detracts from them—whether the evidence supporting the Board's decision has been so undermined by cross-examination or by other evidence that it cannot support the decision. *Moore*, 51 Kan. App. 2d at 137-38. Unless that has happened, we must uphold findings supported by substantial evidence even though evidence in the record would have supported contrary findings. *Poff v. IBP, Inc.*, 33 Kan. App. 2d 700, 706, 106 P.3d 1152 (2005).

Under the statutes that were in effect in 2007 when Ghere said he was injured, "[t]he employee shall not be entitled to recover for the aggravation of a preexisting condition, except to the extent that the work-related injury causes increased disability." K.S.A. 2007 Supp. 44-501(c). Ghere essentially claims that he suffered an aggravation of a preexisting condition in his lower left leg. The Board disagreed with Ghere's claim and concluded that Ghere didn't prove that he suffered an injury arising out of and in the course of employment.

Ghere argues that this conclusion was incorrect—that he did carry his burden of proving that the 2007 incident at work aggravated, accelerated, or intensified the preexisting vein condition in his leg. But the record contains evidence that the swelling that Ghere experienced while responding to that incident couldn't have been caused by running for such a short distance and time period. That evidence was sufficient to support the Board's decision.

The Board paid special attention to the opinions of Dr. Stephanie Oberhelman, a general surgeon who specialized in phlebology, the study of veins. Dr. Oberhelman said it was "a physical impossibility" for the body to pump the required amount of blood as quickly as it did to cause the kind of swelling that Ghere said he had experienced during

5

the 2007 incident. She said that she didn't "know that [Ghere] had an increase in swelling" despite Ghere's claims that the swelling increased "markedly" when responding to the emergency. But even if Ghere did experience the swelling as he alleges he did, Dr. Oberhelman said, she didn't know what would have caused the increase in swelling.

Dr. Craig Heligman, an occupational-medicine doctor whose opinions were similar to Dr. Oberhelman's, also evaluated Ghere. Dr. Heligman described how Ghere "already had a condition that would give him an enlarged leg[, and] the activity of standing and then running would not cause the leg to swell" at the time of the 2007 incident. He said that it would have been physiologically impossible for the amount of blood required to cause the type of swelling Ghere experienced to have been pumped to Ghere's leg in a minute and a half. Dr. Heligman also said he thought Ghere would have experienced the same swelling that he experienced when he responded to the work incident "regardless of his activity at work."

In his report, Dr. Heligman concluded that Ghere's "condition is not work related" and Ghere's "work did not cause, contribute, aggravate, or exacerbate this congenital condition." He explained that when Ghere responded to the incident at work, it was "likely that the swelling had already begun and he just noticed it when he attempted to get up and respond to the workplace issue."

Although Dr. Oberhelman and Dr. Heligman both said that they didn't believe the swelling Ghere experienced related to his preexisting vein condition, there were three other physicians who reached different conclusions: Dr. Daniel Connelly, a general surgeon who specializes in vascular surgery; Dr. George Fluter, a physiatrist; and Dr. Gary Jost.

As the Board noted, the ALJ relied on the opinions of Dr. Connelly. Dr. Connelly explained that Ghere's problems with his left leg began when he was born. When asked to

6

explain the acute exacerbation of the swelling in Ghere's leg, Dr. Connelly said "it's very difficult to decide what happened. . . . I don't know what the event was that occurred on that day. But subsequent to that his symptoms have become much worse and he has had multiple interventions . . . ." He also said that he thought Ghere's running in response to the emergency accelerated, aggravated, or intensified Ghere's preexisting condition.

The Board said, "While Dr. Connelly opined the incident exacerbated [Ghere's] condition, he also seems unsure as to what happened during the incident. . . . He also testified a normal leg would not have swollen as largely as [Ghere's] leg in a minute and a half." The Board also noted Dr. Connelly's response to whether Ghere would be in his current condition but for running in response to the emergency, to which Dr. Connelly replied that he didn't know for sure. In essence, the Board questioned Dr. Connelly's opinion because of his overall lack of knowledge about what happened the day of the incident.

The Board also questioned Dr. Fluter's opinion which, like Dr. Connelly's, was favorable to Ghere. Dr. Fluter said that "[b]ased upon the available information and to a reasonable degree of medical probability, there is a causal/contributory relationship between Mr. Ghere's current condition and the reported injury" Ghere sustained in 2007. But the Board concluded that Dr. Fluter's opinion "seemingly ignores [Ghere's] history of left leg issues." The "Preexisting Status" section of Dr. Fluter's report stated only that Ghere "had varicose veins affecting the left lower extremity. He underwent left lower extremity varicose vein stripping in 2002. He had no problems with the left lower extremity following the procedure."

Our record doesn't include a deposition or full medical evaluation from Dr. Jost, the third physician whose testimony supported Ghere's claim. But a 2011 order from the Board noted that Dr. Jost said, "'I do feel . . . that probably primary lymphedema should be considered. It is probably traumatic since it started markedly after the injury[.]'"

7

Ghere's argument boils down to a claim that the Board should have relied on the opinions of Doctors Connelly, Fluter, and Jost instead of those from Doctors Oberhelman and Heligman. But the Board, not this court, must make these factual and credibility determinations. See *Lake v. Jessee Trucking*, 49 Kan. App. 2d 820, Syl. ¶ 4, 316 P.3d 796 (2013). Although there was conflicting evidence, the Board was free to accept such portions of the testimony that it thought was credible. We see nothing in the cross-examination of Doctors Oberhelman and Heligman that so undermines their testimony as to make it improper for the Board to rely upon it.

In sum, there was testimony from two doctors that Ghere's condition wasn't aggravated, accelerated, or intensified during the 2007 incident. We conclude that the Board's conclusion on this point was supported by substantial evidence.

II. *Ghere Failed to Prove a Permanent Impairment to His Back, Leg, or Venous System.*

Ghere's second argument is that the Board erred by finding that he didn't sustain permanent impairment to his back, leg, or venous system. The State responds that Ghere failed to prove that he sustained a compensable back injury. Once again, we must uphold the Board's decision if we find that the decision is supported by substantial evidence—even though some evidence in the record would have supported contrary findings. *Poff*, 33 Kan. App. 2d at 706.

Here, the Board concluded that Ghere "did not prove he had a permanent functional impairment as a result of said injury." It concluded that "prior to the incident, [Ghere] had a long history of receiving treatment for his congenital condition." Once again, there's plenty of evidence to support the Board's conclusion.

8

The Board seemed to be most swayed by how Dr. Connelly didn't say the exacerbation of Ghere's condition caused a permanent functional impairment. Indeed, Dr. Connelly testified that Ghere had been suffering from a "significant medical problem" for a long time and that "[i]t is very likely that [Ghere] could have done something that had . . . the same result whether he was running during work or running in a soccer game or playing with his children."

Other testimony also supports the Board's conclusion that Ghere wasn't permanently impaired. Dr. Paul Stein, a neurosurgeon, said that Ghere hadn't seemed to have undergone an acute change that could be specifically related to an incident, but had been suffering from long-term back issues instead. Dr. Oberhelman said Ghere shouldn't stand or sit for prolonged periods of time; she said she wasn't aware of any task associated with being a prison guard that Ghere couldn't do. And Dr. Heligman explained that Ghere suffered from swelling both before and after the incident; Dr. Heligman said that there was no way to know "[t]he degree of change [of swelling] at the time of the event that he thinks was present, . . . but I would venture a guess and say there really wasn't much difference."

Ghere seeks to undermine the credibility of Dr. Oberhelman by arguing that she "does not even own a copy of the AMA Guides, yet she is attempting to give opinions regarding causation and impairment." But Dr. Oberhelman is a licensed doctor who provided detailed testimony about Ghere's medical condition, and her testimony was also supported by other evidence. Ghere doesn't provide any legal support for his position that a doctor's expert medical opinion about whether a patient is disabled is rendered so unworthy that the Board may not rely on it simply because of the doctor's lack of knowledge about some portion of the permanent-impairment guidelines.

On this issue, like the first one on appeal, there is contradictory evidence from the doctors. Although some doctors concluded that Ghere was permanently impaired, that

9

evidence wasn't so strong that it wholly undermined the evidence of other doctors to the contrary. The Board was therefore entitled to rely upon the testimony it found most credible. See *Jessee Trucking*, 49 Kan. App. 2d 820, Syl. ¶ 4. We conclude that the Board's conclusion that Ghere didn't suffer from a permanent impairment was supported by substantial evidence.

We affirm the Board's decision.