NOT DESIGNATED FOR PUBLICATION

No. 119,873

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GEORGIA A. NETHERLAND,
*Appellee*,

v.

MIDWEST HOMESTEAD OF OLATHE OPERATIONS LLC,

and

TRAVELERS INDEMNITY COMPANY OF AMERICA,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed September 13, 2019. Affirmed.

*William L. Townsley III* and *T. Chet Compton*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellants.

*James E. Martin*, of The Law Office of James E. Martin, of Overland Park, for appellee.

Before BUSER, P.J., GREEN and MALONE, JJ.

PER CURIAM: Midwest Homestead of Olathe Operations, LLC, and its insurance carrier, Travelers Indemnity Company of America, collectively referred to here as Midwest, appeal the Kansas Workers Compensation Appeals Board's (the Board) order awarding workers compensation benefits to Georgia A. Netherland for a hip injury she sustained after falling at the assisted living and rehabilitation facility where she worked. Midwest claims that (1) it was denied its due process and a right to a fair hearing because

1

the administrative law judge (ALJ) based his decision on personal animus against Midwest and the Board did not conduct the required independent review on appeal; (2) the fall that caused Netherland's injury did not arise out of her employment; and (3) Netherland is not totally and permanently disabled. For the reasons stated in this opinion, we affirm the Board's decision.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts below largely are taken from the Board's order. On December 20, 2014, Netherland, who was 70 years old and worked for Midwest as a cook, completed her 10-hour shift and was walking to clock out. Her coworker, Erlinda Ilacad, asked her about leftover food from that day's lunch. Under Midwest policy, employees could pay $2 and eat a meal consisting of the food left over from what Netherland had made for lunch or what she had made for dinner. When Netherland turned around to respond, she found Ilacad face-to-face with her. Startled that Ilacad was so close, Netherland began to back away, and she fell. Netherland later testified that she tried to grab Ilacad's shoulder, but she fell to the floor in the kitchen.

According to Ilacad's later deposition testimony, she, Netherland, and another coworker, Michele Blanchett, were having a conversation in the kitchen. When Ilacad turned to face Blanchett to talk to her, she felt someone grab at her shoulder. When Ilacad turned back toward Netherland, Netherland was lying on the floor. Ilacad denied calling out to Netherland and says she was not face-to-face with Netherland just before the fall.

Blanchett testified that before the fall, Netherland was "leaning against an island in the kitchen to support her bad hips." Blanchett testified that Ilacad was about 3 feet away with her back turned toward Netherland, Ilacad was not talking to Netherland, "and at no point was [Ilacad] face to face with" Netherland. Blanchett also testified, however, that Netherland "may have been talking to [Ilacad] and then to" Blanchett, but she maintained

2

that Netherland did not grab at Ilacad's shoulder before or during her fall. Rather, according to Blanchett, Netherland "appear[ed] to black out and fall to the floor. . . . Blanchett testified claimant did not holler, her hands did not go up to try and grab something, [and] she just went straight down."

Regardless of the exact circumstances of the fall, Netherland had pain in her right hip after she fell, and she could not get up. Blanchett called 911 and the fall was reported to the on-duty nurse and the main nurse at the facility. Paramedic Leslie Michel responded to the scene. Michel later testified that Netherland told her that she had tripped and fallen over her feet while walking in the kitchen and had landed on her right hip. Netherland went by ambulance to the hospital, and hospital records showed that Netherland said she had "tripped over [her] own feet" and that her feet had become "tangled with a co-worker, causing her to fall."

James A. Hurst, M.D., the on-call orthopedic surgeon, later testified that he understood that Netherland "was at work and her legs got tangled up or she slipped and fell." He diagnosed Netherland with a fractured right hip, and he recommended a half-hip replacement, which he performed the next day, December 21, 2014. Netherland remained in the hospital for 4 days and then lived in a rehabilitation facility for 31 days, after which she attended outpatient rehabilitation appointments twice each week. By February 2015, Netherland was no longer using a walker, her pain had begun to lessen, and she was improving. She continued physical therapy and, by March 2015, she was using a cane, but remained unsteady on her feet.

On March 3, 2015, Netherland applied for workers compensation benefits for "low back and right hip" injuries sustained in the "slip and fall." On April 20, 2015, Edward J. Prostic, M.D., examined Netherland. Prostic's records reflect that she complained of

"frequent pain in the right hip laterally, difficulty lying on her right side, difficulty initiating walking[,] and an inability to stand for more than short periods of time or walk more than short distances. . . . [Netherland] had a limp, was unable to squat or kneel, and was reluctant to do stairs. Dr. Prostic noted [she] walked slowly, with an antalgic gait.

"Dr. Prostic examined claimant's right hip and found alignment to be satisfactory, the right leg was three quarters of an inch shorter than the left leg and the right thigh three quarters of an inch smaller in circumference than the left, four inches above the superior pole of the patella. There was severe tenderness of the greater trochanter. [Netherland] was able to walk a few strides on her toes and on her heels, but was reluctant to squat.

"Ultimately, Dr. Prostic opined [Netherland] sustained a femoral neck fracture of her right hip and had considerable difficulty from trochanteric bursitis and post-traumatic hip arthritis."

Prostic suggested treatment consisting of a corticosteroid injection and exercise, but he opined that if this treatment did not work, the next step was total hip replacement arthroplasty. Prostic also opined that Netherland "did not have sufficient ability to stand or walk to return to her previous occupation as a cook."

The ALJ held a preliminary hearing on July 7, 2015, after which the ALJ found that Netherland's fall and the injury to her shoulder and her hip arose out of and in the course of her employment and she was entitled to benefits. Midwest appealed the preliminary hearing order to the Board, which affirmed the ALJ's holding "with regard to the accident on December 20, 2014, as it relates to [Netherland's] hip injury, but reversed with regard to the claimed left shoulder injury."

On October 12, 2015, board certified orthopedic surgeon Jeffery Salin, D.O., examined Netherland. He concluded that Netherland had "a somewhat limited internal range of motion and fairly good external range of motion," and he noted that she "had no pain with range of motion about the hip." Salin recommended that Netherland wear a tall, laced shoe to provide support and that she use a one-half inch shoe lift. At a follow-up appointment on January 7, 2016, Salin saw "significant improvement" from use of the

shoe lifts, but he also saw "some residual hip discomfort due to the leg length discrepancy." Salin "imposed work restrictions of no prolonged standing, or prolonged walking, no squatting, no bending, no kneeling, and no stooping."

On January 18, 2016, Salin found Netherland to be at maximum medical improvement. Two days later, Salin "provided a permanent partial functional impairment rating of 43 percent to the left [*sic*] lower extremity, based on the 4th Edition of the AMA *Guides*." Although Salin recorded no permanent restrictions, he later testified that she had "light demand vocation restrictions, along with a 17[-]pound lifting restriction."

On February 26, 2016, Netherland returned to see Prostic again. Prostic opined that Netherland would continue to need assistive devices to walk and would likely need a total hip replacement arthroplasty at some point. Prostic believed that the December 20, 2014 fall "was the prevailing factor" for Netherland's future medical needs. Prostic further opined that Netherland "is more probably than not totally and permanently disabled from gainful employment," she "has very little ability to stand or walk more than briefly, and [she] has no transferrable skills that would allow her to perform permanently sedentary work." Prostic assessed Netherland as having a 15 percent functional impairment to the body as a whole.

On April 6, 2016, Netherland met with vocational rehabilitator Michael J. Dreiling so that Dreiling could "identify work tasks" Netherland had performed during the five years before her injury and "determine or evaluate what her ability is to earn wages in the labor market subsequent to her injury." Dreiling concluded that Netherland's "lack of any further formal academic or vocational training . . . was very limiting for her, especially taking into account the very limiting medical restrictions that had been placed upon her since the work injury." He recommended that Netherland perform only "sit down type work" and since only one of the eight work tasks he identified allowed for sitting down, Dreiling concluded that Netherland suffered an 88 percent work task loss. Considering

Netherland's background and vocational profile, Dreiling "felt that [Netherland] was essentially and realistically unemployable."

On May 10, 2016, Netherland underwent total surgical replacement of her left knee. She had recovery complications that left an open wound causing an infection. Netherland had a second surgery on her knee in October 2016 and, despite the complications with healing, she had no restrictions on her left knee after that surgery.

On August 24, 2016, Lowry Jones, Jr., M.D., performed an independent medical examination (IME) of Netherland. Jones assigned Netherland a 15 percent permanent partial impairment to the body as a whole, and he opined that she should be restricted to "primarily sedentary activity, with no prolonged standing and walking."

The regular hearing occurred on December 6, 2016, and Netherland testified. Under "a pre-trial discussion" between the parties and the ALJ presiding over the proceedings, the ALJ set Netherland's terminal date as December 22, 2016, and Midwest's terminal date as January 23, 2017. Netherland timely completed her presentation of evidence by submission into the record before the ALJ.

On January 5, 2017, Netherland met with vocational rehabilitation counselor Michelle Sprecker so that she could assess a task loss and wage loss for her date of injury. Sprecker learned that Netherland had not graduated from high school and had worked as a cook and housekeeper for the 15 years before her injury. She identified 13 tasks Netherland had performed in her job for Midwest: prep work; cooking food; plating food; stocking the snack area; ordering food and supplies; stocking and rotating product; taking inventory; baking; washing dishes; cleaning floors; cleaning the kitchen and kitchen equipment; attending meetings; and posting meals on a board.

At a later deposition, Sprecker opined that based on Salin's total lack of written permanent physical restrictions, Netherland had no task loss and she physically could return to preinjury work as a cook. Based on the restrictions imposed by Prostic and Jones, however, Sprecker opined that Netherland had a 69.2 percent task loss. Sprecker then conducted a transferable skills analysis and found that Netherland could work as "a parking lot cashier, a surveillance system monitor, an information clerk, or a telemarketer." She thus concluded that Netherland was employable.

Jones later reviewed the task list Sprecker had created related to Netherland's prior job, and he opined that Netherland could no longer perform 8 of the 13 tasks, resulting in a 61.5 percent task loss. Although Jones believed that Netherland was still employable, he opined that Netherland's "only option for functional employment would be sedentary activity, because of [her] age, her education, and her background, there is likely very little that she could do other than sedentary activities."

On January 23, 2017, Midwest filed a motion for extension of its terminal date, asserting that it had been unable to schedule and obtain expert testimony essential to its defense against Netherland's claim. Midwest asked that the terminal date be extended from January 23 to March 31, 2017. Later, while a hearing date before the ALJ was pending, Midwest notified Netherland that it would depose Hurst on February 7, 2017; it would depose Salin on February 23, 2017; it would depose Michel and Ilacad on March 21, 2017; and it would depose Jones on March 30, 2017. Netherland opposed the request to extend Midwest's terminal date, and she moved to quash the five depositions Midwest sought to take after the terminal date. She contended that the untimely deposition scheduling was "done for no other reason than delay and harassment."

The ALJ held a hearing on March 7, 2017, on the motions pending before it, and it found good cause for the delay in taking Jones' deposition. But the ALJ found that Midwest had not shown good cause for its delay in deposing Hurst, Salin, Michel, and

7

Ilacad. Thus, the ALJ granted Midwest's motion to extend its terminal date "for the sole purpose to taking the deposition" of Jones, and it granted Netherland's motions to quash with respect to the depositions of Hurst, Salin, Michel, and Ilacad.

On March 28, 2017, Midwest completed its submission of evidence and contributions to the record before the ALJ. Along with arguing to the ALJ that Netherland had no right to workers compensation benefits, Midwest also asked the ALJ to reconsider the order quashing the depositions of Hurst, Salin, Michel, and Ilacad.

On June 8, 2017, the ALJ issued its order finding that on December 20, 2014, Netherland sustained an accidental injury to her hip arising out of and in the course of her employment. The ALJ "specifically determined that [Netherland] is an individual of high creditability, and, as such, [the ALJ was] persuaded regarding her version of what occurred on December 20, 201[4]." The ALJ further found that Netherland was "realistically incapable of engaging in any substantial and gainful employment" and she was permanently and totally disabled. The ALJ denied Midwest's request to reconsider its order quashing the depositions of Hurst, Salin, Michel, and Ilacad, finding that Midwest displayed "an absolute lack of diligence" in trying to schedule those depositions.

Midwest sought review by the Board, focusing on the ALJ's order quashing the depositions. The Board heard oral argument on October 12, 2017. On November 20, 2017, the Board issued an order voiding the ALJ's award and remanding with instructions to allow Midwest to complete its depositions of Michel and Ilacad within 60 days for consideration of those depositions and the depositions of Salin and Hurst, which had already been taken. In its order, the Board characterized the ALJ's finding as "overly critical" and stated that "to allow a matter to go for so long and then cut off the creation of a party's case so abruptly raises concern." The Board found the ALJ's decision to exclude Hurst's and Salin's depositions "harsh," and it found that the ALJ had denied Midwest a reasonable chance to be heard and to present evidence.

8

On remand, Midwest completed its depositions and the ALJ considered all of the evidence before it. The ALJ's order on remand, issued on February 19, 2018, once again awarded benefits to Netherland and found her permanently and totally disabled. Along with a detailed recitation of facts and legal analysis, the order also included about three pages challenging the Board's November 2017 decision and reasserting the correctness of the ALJ's March 2017 order quashing the depositions. The ALJ challenged the Board's "bewildering" "lack [of] a basic understanding of" the Kansas Workers Compensation Act (the Act) and called the Board's determination that Midwest was not given adequate time to present its defense "ludicrous." The ALJ concluded:

> "A personal note to Ms[.] Netherland, regarding the delay and hence the denial of justice which occurred in this claim. Claimant and Respondent have a right to an expeditious and fair determination of rights and obligations under the Workers Compensation Act. That is one of the reasons the legislature placed time constraints on aspects of the Act. . . . Unfortunately, Ms[.] Netherland, you have been the victim of inexplicable delays perpetrated by the Respondent, with the Board of Review's complicity.
>
> "In my career, which has span[ned] five decades, I have never witnessed such deliberate intent to subvert the meaning and spirit of the Kansas Workers Compensation Act. This behavior on behalf of the Respondent, is not supposed to be tolerated. More disappointing, [*sic*] is the Board['s] activities and decisions in this matter. The Board is supposed to exist to review and correct inappropriate rulings, not to perpetuate delay, injustice, and protect attorneys who ignore statutory provisions and the spirit and intent of the Act. The Board's ruling in your claim, Ms. Netherland, is perhaps one of the worst I have witnessed, and for that, I apologize. Without doubt, members of the Board should read the entire record, [*sic*] before issuing opinions such as the one that you experienced, which caused a delay of more than twelve months.
>
> "It is my hope Ms[.] Netherland, your claim will not be further victimized by the Board by what is written herein."

9

Midwest sought review by the Board. The articulated issues in the request for review were

> "1) whether claimant sustained injury by accident arising out of and in the course of employment; 2) nature and extent of injuries, if any; 3) claimant's entitlement to additional [temporary total disability benefits (TTD)], if any; 4) claimant's entitlement to future medical; and 5) application of an offset for social security retirement benefits."

Midwest's brief to the Board raised these arguments: (1) Netherland's injury did not occur "in the scope and course of employment" because (a) it did not result from a work-related risk, (b) it resulted from a neutral risk that was not work related, and (c) the fall was "idiopathic, or unexplained"; (2) the ALJ erred in finding that Netherland was permanently and totally disabled; and (3) the ALJ erred by declining to offset the workers compensation benefits awarded in light of Netherland's receipt of social security benefits.

On July 26, 2018, the Board issued an order affirming the ALJ in part and modifying in part. The order included a recitation of the relevant facts in the record, largely similar to the facts set forth above. At the end of the facts section, the Board revisited its more personal exchange with the ALJ, noting:

> "A dispute arose during the litigation of this matter, with respondent objecting to the ALJ's decision to grant claimant's motion to quash certain depositions taken by respondent. The Board reversed the order and remanded the matter to the ALJ, ordering those depositions be included in the record. This resulted in a rather venomous response by the ALJ in his Award of February 19, 2018. The Board is uncertain as to the reason for this unnecessary attack. It does recognize this ALJ has recently retired and, over the years, was reversed by the Board on occasion. Whether this attack was generated by an overzealous desire for a last parting shot at the Board, [*sic*] is unknown. However, the Board stands by its decision of November 20, 2017. A parties [*sic*] right to due process is more important than the personal feelings of an ultra-sensitive ALJ."

The Board then agreed with the ALJ's determination that Netherland's version of the events leading to the fall was "the most credible in this record." The Board reasoned: "Whether claimant was startled by Ms. Ilacad, it appears claimant suffered a fall which arose out of and in the course of her employment, and that fall is the prevailing factor for claimant's hip injury, resulting medical treatment, functional impairment and permanent disability." The Board further concluded, as had the ALJ, that Netherland "was permanently and totally disabled as the result of the accident on December 20, 2014." The Board found that Midwest had not presented persuasive argument on its articulated issues about additional TTD or future medical expenses and, finally, the Board modified the ALJ's award to allow a credit against the TTD for Netherland's social security benefits and to modify the date the TTD began.

On August 23, 2018, Midwest filed its petition for judicial review. Midwest raises three arguments on appeal: (1) it was denied its due process right to a fair hearing because the ALJ bore personal animus against it and the Board abdicated its responsibility to provide independent de novo review, simply agreeing with the ALJ's findings; (2) Netherland's injury did not arise out of her employment; and (3) Netherland was not permanently and totally disabled. We will address each of these claims in turn.

WAS MIDWEST DENIED ITS DUE PROCESS RIGHT TO A FAIR HEARING?

Midwest argues that it "was denied due process because there was no fair hearing before the ALJ, an issue which carried through to the Board level when the Board failed to conduct the required de novo review." Midwest asserts that the ALJ bore "personal animus" against it, as shown by the ALJ's (1) finding that Netherland's account of the accident was credible, (2) faulty legal analysis that led to the award of benefits to Netherland, and (3) description of Netherland as a "victim" of the "inexplicable delays" Midwest had "perpetrat[ed]." Midwest further contends that the Board denied its due process right to a fair hearing by agreeing with the ALJ's determination that Netherland's

account of her injury "appears the most credible." Midwest argues that "[t]he Board wholly failed to engage in" reviewing the ALJ's credibility determination to determine whether it was supported by the record as a whole.

Netherland first responds that this issue is not properly before this court because Midwest did not raise it below. In its reply brief, Midwest asserts that it did raise the due process claim in its brief submitted to the Board. The only portion of that brief to which Midwest cites discusses what Midwest calls the ALJ's "tantrum" and the ALJ's "fanciful allegations against both respondent's counsel and this Board." The brief continues: "Respondent's counsel applauds the ALJ for his transparency. It is clear the ALJ prejudged the merits and that he was more influenced by misplaced anger than the credible evidence. Fortunately, this Board conducts a de novo review and is not required to give any deference to the ALJ's tantrum." Midwest asserts that this statement "is the very essence of [their] due process claim on appeal."

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governs our review. *Atkins v. Webcon*, 308 Kan. 92, 95, 419 P.3d 1 (2018). The KJRA identifies four situations in which "[a] person may obtain judicial review of an issue that was not raised before the agency." See K.S.A. 2018 Supp. 77-617. In other circumstances, "[a]n appellate court will not consider an issue in a workers'-compensation [*sic*] appeal if it was not raised in the administrative hearing. [Citations omitted.]" See *Scheidt v. Teakwood Cabinet & Fixture, Inc.*, 42 Kan. App. 2d 259, 264, 211 P.3d 175 (2009). Moreover, Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34) requires that each issue raised in an appellant's brief "must begin with . . . a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court."

Midwest's initial appellate brief did not comply with Rule 6.02(a)(5). It cited neither the location in the record where Midwest raised a due process issue nor the

12

location where that issue was ruled on. As discussed above, Midwest asserts in its reply brief that it raised "the essence" of its due process issue through a single paragraph in its brief to the Board, a paragraph which did not refer to due process. The assertion Midwest made in a brief to the Board does not sufficiently raise a due process issue. Cf. *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) (finding that a two-sentence paragraph in appellate briefing addressing a cruel and unusual punishment argument was "woefully insufficient" to preserve the claim for appellate consideration). In other words, raising the "essence" of an issue is insufficient to preserve it for appellate review.

In addition, Rule 6.02(a)(5) not only requires a party to identify where it raised the issue below, it requires a party to identify where that issue was ruled on. Even in its reply brief, Midwest has not asserted that the Board ever ruled on a due process issue, and a review of the Board's order reveals that the Board did not identify a due process question as one of the issues before it, nor did the Board rule on a due process issue. Midwest failed to challenge any inadequacy of the Board's findings of fact or conclusions of law by asking the Board to make more specific findings or conclusions.

Litigants who fail to comply with Rule 6.02(a)(5) do so at their own peril. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Kansas appellate courts have repeatedly found arguments abandoned or unpreserved by litigants who failed to comply with Rule 6.02(a)(5). See, e.g., *In re Care & Treatment of Snyder*, 308 Kan. 626, 640, 422 P.3d 85 (2018); *Jarvis v. Kansas Dept. of Revenue*, 56 Kan. App. 2d 1081, 1097, 442 P.3d 1054 (2019). In sum, we agree with Netherland that the due process claim is not properly before this court because Midwest did not raise it below and it has provided no explanation why this court should consider it for the first time on appeal.

In any event, we will briefly address the merits of the claim. When reviewing an administrative agency's final action, this court considers whether any error was harmless. See K.S.A. 2018 Supp. 77-621(e); *Sierra Club v. Moser*, 298 Kan. 22, 47, 310 P.3d 360

13

(2013). Even assuming solely for the sake of argument that the ALJ was prejudiced against Midwest, we believe that the record reflects that the Board provided independent, de novo review of the ALJ's decision. See *Pyl v. Norcraft Co.*, No. 90,278, 2004 WL 48872, at \*4 (Kan. App. 2004) (unpublished opinion) (finding claimant was not denied due process by the ALJ because Board provided independent de novo review).

Contrary to Midwest's assertions, the record does not reflect that the Board failed to conduct a de novo review or that it "simply agreed with the ALJ" that Netherland's version of the events leading to her fall was the most credible. The beginning of the Board's order makes clear that "[t]he Board has considered the record." The conclusion of the order explains again that the Board "reviewed the entire evidentiary file contained herein." Finally, we note with significance that the concurring opinion filed by one board member wanted "to make it crystal clear to the parties and to any appellate court which may consider this matter in the future that [the ALJ's] commentary had no bearing on the board's decision in this matter."

Turning to Midwest's argument that the lack of de novo review is evident in the Board's finding that Netherland was the most credible, the order's findings of fact reflect Netherland's, Ilacad's, and Blanchett's differing memories of Netherland's fall. The order also expressly states:

> "This record contains multiple descriptions of the incident on December 20, 2014, when [Netherland] suffered injuries to her right hip. The ALJ found, and the Board agrees, the description offered by [Netherland] appears the most credible in this record. Whether [Netherland] was startled by Ms. Ilacad, it appears [Netherland] suffered a fall which arose out of and in the course of her employment."

While an agency *disagreeing* with an ALJ's credibility determination must set forth its reasons for doing so, see *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010), Midwest provides no legal authority for its assertion that

14

an agency must similarly set forth reasons for agreeing with an ALJ's credibility determinations. The ALJ and the Board were the fact-finders in this case and had the authority to find Netherland's testimony more credible than the testimony of the other witnesses about how the accident occurred. Just because the Board agreed with the ALJ's findings of fact does not mean that the Board did not conduct independent review. And just because the ALJ and the Board found Netherland's testimony to be credible does not mean that the fact-finders were biased.

In summary, Midwest fails to establish that it was denied its due process right to a fair hearing. Any lack of due process afforded to Midwest by the ALJ was cured by the Board's independent de novo review of the case.

### DID THE ALJ AND THE BOARD ERR BY FINDING THAT NETHERLAND'S INJURY AROSE OUT OF HER EMPLOYMENT?

Only injuries that "arise[] out of and in the course of employment" are compensable under the Act. K.S.A. 2018 Supp. 44-508(f)(2). For an injury that results from an accident to "arise out of" one's employment, there must be "a causal connection between the conditions under which the work is required to be performed and the resulting accident." See K.S.A. 2018 Supp. 44-508(f)(2)(B)(i). Nor does an injury arise out of and in the course of employment if it arises "out of a neutral risk with no particular employment or personal character." K.S.A. 2018 Supp. 44-508(f)(3)(A)(ii). As the Kansas Supreme Court has explained:

> """The two phrases arising 'out of' and 'in the course of' employment, as used in [the Act], have separate and distinct meanings; they are conjunctive, and each condition must exist before compensation is allowable. The phrase '*out of*" employment points to the cause or origin of the worker's accident and requires some causal connection between the accidental injury and the employment. An injury arises 'out of' employment when there is apparent to the rational mind, upon consideration of all the circumstances, a

15

causal connection between the conditions under which the work is required to be performed and the resulting injury. Thus, an injury arises 'out of' employment if it arises out of the nature, conditions, obligations, and incidents of the employment. The phrase '*in the course of*' employment relates to the time, place, and circumstances under which the accident occurred and means the injury happened while the worker was at work in the employer's service.'"

". . . And although it is impossible to establish a bright-line test to determine whether an injury arises out of employment, 'the focus of inquiry should be on whether the activity that results in injury is connected to, or is inherent in, the performance of the job.' Simply put, '"[t]he right to compensation benefits depends on one simple test: Was there a work-connected injury?"' [Citations omitted.] " *Atkins*, 308 Kan. at 98-99.

Midwest concedes that Netherland was injured "in the course of" her employment, but it asserts that the ALJ and the Board erred in finding that the injury "arose out of" her employment. Midwest argues that there was no "causal connection between the conditions under which the work [was] required to be performed and the resulting accident." Rather, it argues that Netherland's injury "arose out of a conversation, and the taking of steps," which "are actions with 'no particular employment or personal character.'" Thus, Midwest claims, Netherland's injury resulted from a "neutral risk" and is not compensable under the workers compensation statutes.

"[W]hile the interpretation or construction of the [Act] is a question of law, 'once that interpretation or construction has occurred, the ultimate question of whether an accident arises out of and in the course of employment is a question of fact. . . .

"Pursuant to K.S.A. 2017 Supp. 77-621(c)(7), a reviewing court shall grant relief only if 'the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole[.]' When reviewing an agency action under K.S.A. 2017 Supp. 77-621(c)(7), '"the appellate court is limited to ascertaining from the record *if substantial competent evidence supports the agency findings*."' '"Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined."'

16

"K.S.A. 2017 Supp. 77-621(d) dictates how to conduct such a review:

"'For purposes of this subsection, "in light of the record as a whole" means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review.' [Citations omitted.]" *Atkins*, 308 Kan. at 95-96.

Thus, an appellate court reviewing the Board's action must (1) "review . . . the evidence both supporting and contradicting the Board's findings"; (2) "examin[e] . . . the presiding officer's credibility determination, if any"; and (3) "review . . . the agency's explanation as to why the evidence supports its findings." 308 Kan. at 97. "The appellate court must determine whether the evidence supporting the Board's decision has been so undermined by other evidence that it is insufficient to support the Board's conclusion." See *Lake v. Jessee Trucking*, 49 Kan. App. 2d 820, Syl. ¶ 4, 316 P.3d 796 (2013). "The party appealing from the [Board's] decision . . . bears the burden of establishing error." See *Sierra Club v. Mosier*, 305 Kan. 1090, 1100, 391 P.3d 667 (2017).

In support of its position, Midwest first cites the Board's decision in *Bieberle v. State*, No. 1,064,235, 2013 WL 5521850 (Kan. Work. Comp. App. Bd. September 23, 2013). In that case, a single Board member affirmed an ALJ's finding that an injury sustained while an employee tripped and fell while briskly walking backwards down a hallway did not arise out of and in the course of her employment. 2013 WL 5521850, at *1, 3. The Board member noted that the claimant's undisputed testimony was "that she did not know why she fell" and that there was "nothing in this record which establishes a connection between walking backwards and the nature and requirements of claimant's

17

work." 2013 WL 5521850, at *3-4. The facts here are distinguishable from the facts in *Bieberle*, which—as a Board decision—does not bind this court.

Midwest also directs this court to our decision in *Graber v. Dillon Companies*, 52 Kan. App. 2d 786, 377 P.3d 1183 (2016), for discussion of the effects of the 2011 amendments to the Act. Midwest notes in its initial brief that the precedential value of this court's opinion in *Graber* is limited because the Kansas Supreme Court granted review of that case. But since the briefing in this case was completed, our Supreme Court issued its opinion in *Estate of Graber v. Dillon Companies*, 309 Kan. 509, 439 P.3d 291 (2019). Neither party filed a Supreme Court Rule 6.09(b) (2019 Kan. S. Ct. R. 39) letter of supplemental authority or otherwise requested supplemental briefing to discuss *Graber*'s effect on Netherland's case. In any event, we will review our Supreme Court's decision in *Graber*.

Terrill Graber, an employee of a subsidiary of Dillon Companies, Inc. (Dillons), was injured when he fell down a stairway after attending a mandatory meeting which he was paid to attend. Graber did not remember the fall, there were no witnesses to the fall, "[a]nd there was no evidence of anything unusual about the stairs that might have caused Graber to trip or slip on them." 309 Kan. at 511. The ALJ found that Graber's "injury arose out of and in the course of his employment." 309 Kan. at 512. The Board reversed, noting that although unexplained falls used to be compensable, the 2011 amendments to the Act altered that historical coverage by excluding accidents and injuries that arise from "idiopathic" causes. 309 Kan. at 512.

Graber appealed to this court, which reversed the Board's decision, holding that "idiopathic"—in the context of the Act—"means 'personal or innate to the claimant.'" 309 Kan. at 512. This court found that Graber's injuries could be compensable if the staircase posed an increased risk sufficient to supply the necessary causal connection between the

employment and the injuries, and it remanded to the Board to reconsider whether Graber's injury arose out of and in the course of his employment. 309 Kan. at 512.

The Kansas Supreme Court granted Dillons' petition for review on the sole issue of the definition of "idiopathic causes." 309 Kan. at 512-13. Our Supreme Court agreed with this court's conclusion that the Act's exclusion from compensability of an accident or injury which arose directly or indirectly from idiopathic causes "renders an injury noncompensable only upon proof the injury or accident arose directly or indirectly from a medical condition or medical event of unknown origin peculiar to the claimant." 309 Kan. at 524. The *Graber* court left for another day the meaning of the "neutral risk" exclusion from compensability also introduced in the 2011 amendments. 309 Kan. at 524. But this court recently addressed that issue in *Johnson v. Stormont Vail Healthcare, Inc.*, 57 Kan. App. 2d ___, 445 P.3d 1183 (2019).

Mary Johnson, a cleaning lady at Stormont Vail Hospital, was injured when she tripped and fell while walking down a hallway on her way to clean another area of the hospital. She "could not say definitively what made her fall—whether she slipped or if her foot caught on something sticky." 445 P.3d at 1185. About nine months later, Johnson fell again at work, she again did not know what caused her to fall, and she again suffered injuries. When Johnson sought workers compensation benefits, Stormont Vail argued that her falls had "resulted from a neutral risk with no particular employment or personal character and were therefore, not compensable." 445 P.3d at 1186. The ALJ disagreed and awarded compensation for both falls. 445 P.3d at 1186.

Stormont Vail sought review from the Board, arguing again that Johnson's injuries resulted from neutral risks or idiopathic causes. The Board disagreed, finding that Stormont Vail bore the burden to prove a personal or neutral risk existed that would exempt Johnson's injuries from compensation. The Board concluded that Johnson's injuries were compensable, reasoning:

19

"'Neither fall involved what would be only a neutral risk, but rather they involved neutral risk with a particular employment character. Walking was required to do the work and Johnson was injured while walking. The Board does not view the [Act] as requiring that a worker explain why an accident or injury occurred when the worker sustains an injury by accident while performing job tasks.'" 445 P.3d at 1186.

Stormont Vail appealed to this court, which agreed with the Board that the Act does not exclude from compensation all injuries that result from neutral risks; it exempts only injuries that "'arose out of a neutral risk *with no particular employment or personal character*.'" 445 P.3d at 1187 (quoting K.S.A. 2018 Supp. 44-508[f][3][A][ii]). This language, and its historical occurrence in workers compensation "neutral risk" analysis, led to the *Johnson* court rejecting the implicit argument that injuries arising from all neutral risks are now noncompensable since the 2011 amendments to the Act. 445 P.3d at 1188.

Turning next to the shifting burden of proof, the *Johnson* court explained that in workers compensation cases, the initial burden of proof is on the claimant to show a right to compensation. 445 P.3d at 1189. If the claimant meets that initial burden and the respondent employer wishes to assert an exception that bars the compensation—such as a neutral risk—the burden of proof to show the exception is on the respondent. 445 P.3d at 1189-90. In other words, the claimant need not prove that the exceptions do not apply. 445 P.3d at 1190. Accordingly, this court affirmed the Board's decision that Johnson's injury was compensable. 445 P.3d at 1190.

Netherland's case is very similar to *Johnson*. According to Netherland's testimony at the December 2016 regular hearing, which the ALJ personally observed and found credible, on the day of her fall, she was walking to clock out at the end of her shift. Under Midwest policy, employees could pay $2 and eat a meal consisting of the food left over from what Netherland had made for lunch or what she had made for dinner. As Netherland walked into the kitchen, Ilacad followed her and asked if she could have

20

leftover lasagna Netherland had made for lunch that day. Netherland turned around to answer and found Ilacad "close in [her] face," which startled her and she fell.

Midwest argues that Netherland's injury "'arose out of a neutral risk with no particular employment or personal character' and is therefore not compensable." Under *Johnson*, this argument fails. Although walking and talking and even turning to respond to a question are neutral risks, these risks had a particular employment character because substantial competent evidence supports a finding that Netherland was engaging in these acts to perform work-related tasks of clocking out and answering a coworker's question about the availability of leftovers from the meals Netherland had prepared that day.

K.S.A. 2018 Supp. 44-508(f)(3)(A)(ii) is not a meaningless provision. For example, if an employee fell for no reason while on a lunch break and was performing no job duties at the time of the fall, this scenario might qualify as an accident or injury which arose out of a neutral risk with no particular employment or personal character. But these are not the facts of Netherland's case. Here, Netherland was engaged in some job duties when she fell and injured her hip, so her benefits are not excluded under the provision at K.S.A. 2018 Supp. 44-508(f)(3)(A)(ii).

The thrust of Midwest's argument on appeal is that Netherland's injury arose from a "neutral risk" so that her recovery is excluded under K.S.A. 2018 Supp. 44-508(f)(3)(A)(ii). We note that in one sentence of its appellate brief, Midwest asserts that Netherland's "fall arose out of nothing more than talking and walking—*activities of everyday living* which have no particular employment character." (Emphasis added.) We do not construe this sentence as an argument that Netherland's injury occurred "as a result of the natural aging process or by the normal activities of day to day living," so that her recovery is excluded under K.S.A. 2018 Supp. 44-508(f)(3)(A)(i). A point raised incidentally in a brief and not argued therein is deemed waived or abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). Moreover, Midwest argued before the

Board that Netherland's injury resulted from a neutral risk that was not work related or that her fall was "idiopathic or unexplained"; it did not argue that the injury occurred as a result of the normal activities of day-to-day living. Generally, an appellate court will not consider an issue in a workers compensation appeal if it was not raised in the administrative hearing. See *Scheidt*, 42 Kan. App. 2d at 264.

To sum up, in light of the record as a whole, considering both the evidence that supports a finding that Netherland's injury arose out of her employment and the evidence that undermines that finding, and taking into account the ALJ's credibility determination and the Board's agreement with that determination, substantial competent evidence supports the Board's conclusion that Netherland's injury arose out of her employment. Netherland established a causal connection between the conditions under which her work needed to be performed and the resulting accident. See K.S.A. 2018 Supp. 44-508(f)(2)(B)(i). On the other hand, Midwest failed to show that Netherland's accident or injury arose out of a neutral risk with no particular employment or personal character. See K.S.A. 2018 Supp. 44-508(f)(3)(A)(ii). Thus, the Board did not err in finding that Netherland's injury was compensable under the Act.

### DID THE ALJ AND THE BOARD ERR IN FINDING THAT NETHERLAND SUSTAINED PERMANENT TOTAL DISABILITY?

Finally, Midwest argues that the ALJ and the Board erred in finding that Netherland sustained a permanent total disability. Instead, Midwest contends that the evidence shows that Netherland is employable in a sedentary job.

Under the Act, "[p]ermanent total disability exists when the employee, on account of the injury, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment." K.S.A. 2018 Supp. 44-510c(a)(2). Our court has long interpreted this to mean that an employee is permanently and totally

disabled when the employee is "essentially and realistically unemployable." *Wimp v. American Highway Technology*, 51 Kan. App. 2d 1073, 1078, 360 P.3d 1100 (2015).

"Whether an employee is able to engage in substantial and gainful employment is a question of fact, and we review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported by substantial evidence." 51 Kan. App. 2d at 1076. In doing so, "we do not weigh conflicting evidence except to determine whether the evidence supporting the Board's decision has been so undermined by cross-examination or other evidence that a reasonable person would not accept it as support of the Board's factual findings." 51 Kan. App. 2d at 1076.

The Board found:

"Claimant has less than a high school education and is physically limited in her abilities to work manual labor jobs, the type of employment claimant has been limited to her whole life. The sedentary jobs the healthcare providers have limited claimant to require the ability to sit or stand for long periods of time, in violation of several of the restrictions claimant currently has. The ALJ, in citing [*Wardlow v. ANR Freight Systems*, 19 Kan. App. 2d 110, 872 P.3d 299 (1993)], determined claimant, with her extreme limitations, lacks the ability to return to the open labor market and is permanently and totally disabled as the result of the accident on December 20, 2014. The Board agrees with that analysis and affirms that finding."

Midwest asserts that three points undermine the finding that Netherland was permanently and totally disabled: (1) the opinions of Prostic and Jones were based on assessments made while Netherland "was greatly limited by her left knee issues," so those opinions are "tainted"; (2) the Board and the ALJ improperly disregarded Salin's testimony even though he was Netherland's treating physician; and (3) Netherland "abandoned the labor market" by failing to attempt to return to work.

23

*The effect of Netherland's left knee issues on Prostic's and Jones' opinions*

A closer look at Prostic's and Jones' deposition testimony helps clarify the effect Netherland's left knee problems had on their opinions. Prostic testified that he first saw Netherland on April 20, 2015, and he found that her right leg was three-quarters of an inch shorter than her left leg, she displayed an antalgic gait, and she had "significant thigh atrophy most likely from pain and disuse." He diagnosed her that her fall at work was the prevailing factor that caused a fracture of the femoral neck. At that time, he believed that Netherland "did not have sufficient ability to stand or walk to return to work as a cook."

Prostic saw Netherland again on February 26, 2016. She informed him that she had "a torn cartilage in her left knee," and he later learned from medical records that she underwent a left knee replacement in May 2016. Prostic also testified, however, that Netherland denied any new injuries or new health problems. At that second appointment, Netherland used a cane for continued and frequent pain in her hip. Upon examining her, he noted that her "range of motion was decreased . . . rather than staying stable and improving." He diagnosed Netherland with "a painful result" from the partial hip replacement, "so she has a post[-]traumatic arthritis of the hip for which she will need a hip replacement." Prostic identified the "prevailing cause" of this as the "accident on or about December 20, 2014." During his deposition testimony, he opined that "[m]ore probably than not, she is totally and permanently disabled from gainful employment" and "[s]he has very little ability to stand or walk more than briefly and she doesn't have transferable skills that would allow her to do permanently sedentary work."

On cross-examination, Prostic agreed that an individual with "a left knee injury [who is] about to receive a total knee replacement" usually has an antalgic gait and could "possibly" display other symptoms Netherland displayed at her February 2016 appointment, such as being stiff when rising from a chair, walking slowly, and using a cane. He also testified, however, that his restriction of Netherland to mostly sedentary

24

employment was "based on her hip. We expected the problems of her . . . left knee were temporary and she will get over them within a short period of time."

Midwest points out that Netherland "continued to suffer with knee issues for months," unlike Prostic's anticipation that she would quickly get over them. She did not experience a smooth recovery from her left knee replacement, but that does not negate the fact that Prostic testified that he did not include the left knee limitations when he formed his opinion that Netherland was totally and permanently disabled. Since Prostic did not consider the knee issues, whether they continued to exist longer than anticipated is irrelevant and does not undermine his opinion that Netherland was permanently and totally disabled from the hip injury she suffered from the December 2014 fall.

Jones examined Netherland on August 24, 2016, about three months after her knee replacement. He noted in his records from the visit that Netherland had not recovered from that surgery well and, at the time of his examination, she still had an open wound and had not fully healed the surgical incision. When asked whether he could "try and sort out what [Netherland's] functional abilities are" since she was experiencing both hip problems and knee problems, Jones explained that he "absolutely" could not take "her left knee out of the formula." He agreed that left knee issues could make right hip issues worse and could affect her gait.

When asked whether an evaluation of Netherland's abilities before her knee issues would better reflect the limitations caused solely by her hip issues, Jones replied: "[T]here's something to be said for that." He later said, "[M]y restrictions took . . . into consideration my examination at the time, but . . . there's something to be said for the fact that . . . her knee may have . . . a[n] effect on her total functional ability by the time I saw her." Jones' restrictions included work that required only a sedentary physical demand level and did not require prolonged standing, walking, or climbing stairs. Jones also

25

recommended no bending, stooping, or crawling, although he acknowledged that part of the difficulty in crawling was because of her left knee.

When Jones was asked to look "just at the right hip and exclud[e] the left knee," and then asked if he would "still recommend[] a sedentary demand level," he replied:

> "The best I can tell, yes . . . . [Y]our question of asking me to separate out the two is very difficult to do. She had a lot of trouble . . . still with her right lower extremity, and it would be difficult for me to say that—even with a good left lower extremity, that I would have changed my mind."

Midwest points out that Jones testified that he thought Netherland was employable. Put in context, however, Jones made clear that he was speaking only about Netherland's physical ability to "get to a job and sit and do the job," and he was not considering her educational background, her skills, or the availability of work. He agreed with the statement that his "opinion in that regard relates exclusively to her physical condition." Moreover, if Midwest is asserting that Jones did not account for the effect of Netherland's left knee issues on his formulating restrictions, that argument fails for the same reason it does when applied to Prostic. Jones testified that even if Netherland's left knee was "good," he likely would not have altered the restrictions. Midwest's argument that Jones' and Prostic's opinions were somehow "tainted" by Netherland's left knee issues is unsupported by the record and, as such, it fails.

*Weight given to Salin's opinions*

Next, Midwest argues that Salin's opinion deserved more weight than Midwest feels the Board afforded it because "the opinion of treating and court-appointed physicians are more reliable than those of a physician hired by one of the parties." In support, it cites two Board orders, but a review of these orders reveals that they do not support Midwest's argument. The first, *Nasi v. Jimmy's Egg*, No. 1,067,478, 2017 WL

26

898263, at *15 (Kan. Work. Comp. App. Bd. February 9, 2017), recognizes the Board's historical deference to the opinions of treating physicians. It does so, however, because "[a] treating physician would have the opportunity to evaluate an injured worker over a lengthy period of time and could develop an opinion based upon multiple examinations, tests, and a lengthy history of associating with claimant," while "[i]ndependent medical examiners are reduced to reviewing records of other physicians and generally have but one opportunity to examine and evaluate the claimant." 2017 WL 898263, at *15.

According to Salin's testimony, he saw Netherland twice: October 12, 2015, when he physically examined her and prescribed a one-half inch shoe lift, and January 7, 2016, when he recommended that she undergo a functional capacity exam. The Board noted a third appointment on February 23, 2017, but that is unsupported by the record; February 23, 2017, was the date of Salin's deposition. In any event, Salin's relationship with Netherland is not the sort of long and involved "treating physician" relationship contemplated in *Nasi*. In that case, the treating physician treated the claimant for four years before the work fall that precipitated the workers compensation claim at issue; during those four years, the treating physician performed two spinal surgeries, reviewed x-rays and CT scans, and conducted examinations both before and after the surgeries. After the fall at work, the treating physician saw the claimant multiple additional times, ordered CT scans, interpreted them, and ultimately performed a third surgery. The material differences between Salin's relationship with Netherland and the treating relationship between the physician and the claimant in *Nasi* undermines Midwest's attempt to use *Nasi* to support an argument that the Board erred here by not affording Salin more deference.

The second order Midwest cites is *Little v. Perkins Restaurant*, No. 1,009,419, 2005 WL 1634407, at *4 (Kan. Work. Comp. App. Bd. June 29, 2005), in which the Board found that the opinion of the court-ordered independent medical examiner to be the most credible opinion in the record about the impairment percentage to the claimant's

27

body as a whole. The Board stated: "Dr. Pratt, as an independent examiner, is intended to be unbiased and, in this situation, the Board finds his opinion to be persuasive." 2005 WL 1634407, at *4. By its own language, the Board limited that statement to the situation before it. It has no application here.

*Netherland's failure to attempt to work*

Finally, Midwest argues briefly that Netherland's failure to apply for work or attempt to return to employment shows that "[s]he has therefore essentially abandoned the labor market and should not be rewarded for doing so." But the record reflects that Netherland was 70 years old at the time of her injury with less than a high school education. She now has a broken hip. Prostic's testimony alone is sufficient to support the Board's finding that Netherland is unemployable. He testified that Netherland was more probably than not permanently and totally disabled from any gainful employment because she had very little ability to stand or walk more than briefly, and she had no transferable job skills that would allow her to perform sedentary work. Likewise, Dreiling testified that Netherland had no transferable job skills and considering her background and vocational profile, she "was essentially and realistically unemployable."

In summary, none of the particular arguments Midwest makes about why the Board erred in finding that Netherland is totally and permanently disabled is persuasive. The Board's finding that Netherland is permanently and totally disabled is supported by substantial competent evidence in light of the record as a whole.

Affirmed.