NOT DESIGNATED FOR PUBLICATION

No. 122,092

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAMES E. RICKSON,
*Appellee*,

v.

KERNS CONSTRUCTION, INC.

and

AUTO OWNERS MUTUAL INS. CO.,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed September 4, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Bruce R. Levine* and *Adam M. Brillhart*, of Wiedner & McAuliffe, Ltd., of Overland Park, for appellants.

Jan L. Fisher, of McCullough, Wareheim & LaBunker, of Topeka, for appellee.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM: Kerns Construction, Inc. (Kerns) appeals the decision of the Workers Compensation Board granting James E. Rickson an award for permanent partial general disability (work disability). Kerns maintains that Rickson's wage loss did not result from his injury. Kerns argues that the Board erred in granting Rickson work disability because Rickson voluntarily resigned from his employment or was terminated for cause. We affirm in part, reverse in part, and remand with directions.

1

*Factual and procedural background*

Rickson worked for Keith Kerns from February 2005 to October 2014. Rickson was originally employed as a carpenter but eventually advanced to a foreman position with supervisory duties.

In June 2014, Rickson slipped and hit his head on the top of the work van's door. Rickson cut his head and felt like he also "jammed" his neck. Rickson received medical treatment for his neck and received light duty restrictions, including no overhead work. Keith claimed he accommodated Rickson by not requiring him to do overhead work, but Rickson disagreed, insisting Keith did not follow his doctor's orders. As of late September 2014, Rickson continued to have pain in his neck.

On October 2, 2014, Keith told Rickson about allegations made by two employees Rickson supervised. They had told Keith that Rickson was spending too much time on the phone, taking time off from the job without authorization, asking them to cover for him, and stealing materials from the job site. At the end of this conversation, Rickson left, unemployed. At a preliminary hearing, Keith and Rickson gave varied accounts of how Rickson's employment ended that day. We summarize their testimony below.

*Rickson's account of Keith's termination of his employment*

According to Rickson, when Keith told him of the employee's allegations against him, Rickson thought the claims were exaggerated, but admitted he felt entitled to take the screws and fasteners. Keith stated, "I was going to fire you but I can't. . . . I've decided that I'm just going to work you when I can and when I can be there to keep an eye on you." Rickson thought that meant that Keith would fire him later. Rickson explained that Keith habitually cut workers' hours to "get rid of people without having to pay unemployment, and stuff like that." Employees called this practice "TV time." So

Rickson asked to "at least get in two more weeks of full-time work." Rickson painted the "two weeks" discussion not as a notice to resign but rather as an attempt to repair his working relationship with Keith. But Keith responded by telling Rickson "get your stuff and leave my property now." So Rickson packed his tools, left, and went to a friend's home. That friend testified that Rickson was "broken up . . . [and] confused that Keith had let him go."

Rickson denied that he quit his job and instead maintained that he "knew what was in store for [him,]" and that he was sent home that day without being allowed to work. Rickson believed Keith may have allowed him to work a couple of days a week, notifying him the morning he was to work, because that is what Keith had done with other employees. Still, he assumed he would be squeezed out of employment and did not return to work for Kerns.

*Kern's account of Rickson's resignation from employment*

Keith's testimony described the same meeting but maintained that Rickson turned in his two weeks' notice. Keith agreed that when he approached Rickson about his coworkers' allegations, he intended only to reprimand Rickson, not to fire him. Rickson responded to his comments by giving two weeks' notice of his resignation. Keith then replied to Rickson's two weeks' notice by saying "well, [Rickson], you don't need to turn in two weeks. You're not going to—I'm not going to work you two weeks. If you're going to quit, you go now." Keith did not fire Rickson—rather Rickson quit.

*Post-employment medical care*

After his employment ended, Rickson continued to receive treatment for his neck injury. Rickson received steroid injections, an electromyogram, and an MRI which showed left paracentral foraminal disc protrusion at C5-6. Rickson's treating physician

performed surgery for the disc protrusion in September 2016. After the surgery, Rickson continued to have pain and cramping. He remained under medical restrictions of not lifting more than 50 pounds and not doing overhead activities.

Rickson received workers compensation benefits but later claimed an underpayment of temporary total benefits. He also requested payment for a medical bill and payment of interest under K.S.A. 44-512b.

*The ALJ's findings*

An Administrative Law Judge (ALJ) awarded Rickson 6.71 weeks of temporary total disability (TTD) compensation for a 16% functional disability, 66.40 weeks of permanent partial disability (PPD) compensation, and payment of medical expenses— including future pain management expenses. But the ALJ denied work disability, finding that Rickson quit his employment and thus did not suffer wage loss:

> "Neither Claimant nor [Keith] is particularly credible as to the events that led to Claimant's separation. So to determine what happened the logic of the actions taken by each individual must be evaluated. When that evaluation is applied, the Court finds and concludes that Claimant quit.

> "There is no dispute that when the separation from employment occurred on October 2, 2014, Claimant offered to stay an additional two weeks. When an individual is terminated it is not logical that they offer to stay an additional two weeks. Secondly, at the time the separation occurred Claimant was being questioned about employee complaints and [Keith] told Claimant he was going to keep an eye on him. These are events that could prompt a person to quit. For these reasons it is found and concluded that Claimant quit his job with Respondent. Therefore, Claimant did not suffer a wage loss that can be used to calculate wage loss and task loss. Therefore, Claimant's award is based on functional impairment only."

The ALJ also held that Rickson was not entitled to more weeks of temporary total benefits because Kerns would have accommodated Rickson's work restriction had he not quit. The ALJ denied Rickson's request for interest under K.S.A. 44-512b.

*The Board's findings*

Rickson petitioned for review of this award. On appeal, Rickson sought work disability, arguing he was entitled to benefits beyond the functional impairment benefits awarded by the ALJ.

The Board reversed the ALJ's decision. Its reasoning stems from four findings:

1. "[Keith was] far less credible than Rickson."
2. "The judge did not find Rickson voluntarily resigned or was terminated for cause, conditions necessary before a work disability award may be denied under K.S.A. 2013 Supp. 44-510e(a)(2)(E)(i)."
3. "The judge's conclusion that Rickson asked for two more weeks of work *only after* being terminated is incorrect."
4. "Kerns Construction would not have provided accommodated work within Rickson's permanent restrictions."

Kerns timely appeals the Board's order, challenging only the award of work disability as defined in K.S.A. 2019 Supp. 44-510e.

*Our standard of review*

Kerns argues that the Board misapplied the law and that Rickson, although entitled to functional impairment benefits, was not entitled to work disability for wage loss.

5

The Kansas Judicial Review Act (KJRA) governs our review of cases under the Workers Compensation Act. K.S.A. 2019 Supp. 44-556(a); *Atkins v. Webcon*, 308 Kan. 92, 95, 419 P.3d 1 (2018). At a hearing before the Board, the claimant has the burden of proving his right to compensation. *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 137, 343 P.3d 114 (2015). Rickson met that burden here. On appeal, the party claiming error has the burden to show error occurred. K.S.A. 77-621(a)(1); *Moore*, 51 Kan. App. 2d at 137. That party is Kerns.

The Act limits the relief granted on appeal. K.S.A. 77-621(c) states that the court shall grant relief only if it determines any one or more of the eight conditions stated are present, including:

> "(4) the agency has erroneously interpreted or applied the law;
>
> . . . .
>
> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act."

Under K.S.A.. 77-621(d), when reviewing evidence "'in light of the record as a whole,'" courts must (1) review evidence both supporting and contradicting the Board's findings, (2) examine the presiding officer's credibility determinations, if any, and (3) review the agency's explanation for its findings. *Atkins*, 308 Kan. at 97. While considering the evidence in light of the record as a whole, this court does not reweigh the evidence or engage in de novo review. *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). But our standard of review requires us to examine the conflicting evidence and determine whether it so undermines the Board's decision that we no longer have confidence in the substantial nature of the evidence. See *Messner v. Continental Plastic Containers*, 48 Kan. App. 2d 731, 750, 298 P.3d 371 (2013).

6

*The Board's credibility findings*

The Board is to provide an independent, de novo review of the record, and it generally owes no deference to the ALJ's factual findings. See K.S.A. 2019 Supp. 44-551(l)(1); see also *Helms v. Pendergast*, 21 Kan. App. 2d 303, 309, 899 P.2d 501 (1995) ("The Board was within its jurisdiction to review the ALJ's order de novo on the record."). But when the ALJ makes credibility findings about a witness who appeared *in person* before that ALJ, the Board should explain its reasons for disagreeing with the ALJ's credibility findings. *Lake v. Jessee Trucking*, 49 Kan. App. 2d 820, Syl. ¶ 3, 316 P.3d 796 (2013); *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010).

That rule applies here. Keith and Rickson testified in person before the ALJ. So the Board must explain its reasons for disagreeing with the ALJ's credibility findings about these primary witnesses.

The ALJ found neither Keith nor Rickson to be particularly credible. So she based her decision on logic—what she believed was reasonable for parties to have done in the situation. She concluded that Rickson had quit but she did not state whether he had done so voluntarily.

The majority of the Board disagreed with the ALJ's credibility findings, concluding "[Keith was] far less credible than Rickson." It found that Rickson was terminated without cause. One member dissented from that credibility finding and from the Board's resulting conclusion that Rickson was terminated without cause.

7

The Board stated several reasons for finding Rickson more credible than Keith:

- Testimony from other employees established that, contrary to Keith's denials, he disciplined them by forced "TV time";
- Rickson's testimony showed Keith reduces employees' hours to try to get them to quit so he will not have to pay unemployment benefits;
- Keith could be a hothead, not the easygoing boss he said he was; and
- Keith admitted he had paid another employee in a way that he could hide his earnings or employment from the government.

But the Board did not totally credit Rickson's testimony either. It found Rickson not credible in asserting that his two weeks' notice was not a notice to resign but rather an attempt to repair his working relationship with Keith. The Board found that testimony was "more contrived after-the-fact than believable." The Board agreed that Rickson gave two weeks' notice of his resignation after Keith related the employees' accusations against him and Keith's plan to supervise him.

Having reviewed the record, we find the Board sufficiently explained its reasons for disagreeing with the ALJ's credibility findings.

*Our standard of review*

Whether the Board erred in applying the law constitutes a question of law over which this court has de novo review. *Nuessen v. Sutherlands*, 51 Kan. App. 2d 616, 618, 352 P.3d 587 (2015). Whether the Board's factual findings were supported by substantial competent evidence constitutes a question of law. *Atkins*, 308 Kan. at 95. "'Substantial competent evidence possesses both relevance and substance and provides a substantial

basis of fact from which the issues can be reasonably determined.'" *In re Equalization Appeal of Wagner*, 304 Kan. 587, 599, 372 P.3d 1226 (2016).

At issue is the Legislature's mandate that "[w]age loss caused by voluntary resignation or termination for cause shall in no way be construed to be caused by the injury." K.S.A. 2019 Supp. 44-510e(a)(2)(E)(i). So if Rickson voluntarily resigned or was terminated for cause, his wage loss is not attributable to his injury, thus he is not eligible for work disability.

*Did the Board err in finding Rickson was terminated without cause?*

The Board held that Keith terminated Rickson without cause. Kerns argues that if Rickson was terminated, he was terminated for cause so he is not eligible for a work disability award.

The Workers Compensation Act does not define what constitutes "cause" for termination. The Board used this definition:

> ""Cause" . . . is a shortcoming in performance which is detrimental to the discipline or efficiency of the employer. Incompetency or inefficiency or some other cause within the control of the employee which prohibits him from properly completing his task is also included within the definition. A discharge for cause is one which is not arbitrary or capricious, nor is it unjustified or discriminatory.' [Citation omitted.]" *Dirshe v. Cargill Meat Solutions Corp.*, 53 Kan. App. 2d 118, 123, 382 P.3d 484 (2016).

That definition is appropriate.

In applying K.S.A. 2019 Supp. 44-510e(a)(2)(E)(i), we must determine whether the employee's termination was reasonable given all the circumstances.

> "'[T]he proper inquiry to make when examining whether good cause existed for a termination in a workers compensation case is whether the termination was reasonable, given all of the circumstances. Included within these circumstances to consider would be whether the claimant made a good faith effort to maintain his or her employment. Whether the employer exercised good faith would also be a consideration. In that regard, the primary focus should be to determine whether the employer's reason for termination is actually a subterfuge to avoid work disability payments.'" *Dirshe*, 53 Kan. App. 2d at 122.

The Board applied this analysis here.

Kerns argues that Keith showed a good-faith effort to maintain the employment relationship, that the termination was reasonable given the circumstances, and that Rickson's lack of good faith is shown by his dishonest work conduct and his sudden decision to give two-weeks' notice. But Keith testified that Rickson was a good worker and that the coworkers' allegations against Rickson did *not* compel him to fire Rickson. Instead, Keith stated all that was necessary was some form of discipline short of termination. The record shows that Keith did not end Rickson's employment because Rickson had stolen time and supplies from him or had otherwise been dishonest with him. Such a termination would have been for good cause. But Keith admitted he did not intend to terminate Rickson's employment even after learning of Rickson's bad acts. Only after Rickson gave his two weeks' notice did Keith decide to terminate him, based on his belief that Rickson would produce less work during those two weeks.

Kerns then argues that terminating Rickson for giving two weeks' notice and because he anticipated diminished effort during those two weeks was a termination for cause. The Board disagreed. The Board agreed that Keith had a policy to stop employment immediately when an employee gives two weeks' notice, in anticipation of diminished effort. But the Board discounted that reason here because Keith admitted that Rickson was a good worker and because other testimony showed Keith had allowed

10

another long-term employee to work two more weeks. Essentially, Keith failed to convince the Board that his assumption of getting less work from Rickson stemmed from anything but speculation, or that he applied the policy even-handedly. So even if a worker's inefficiency after giving notice of resignation could constitute good cause for termination, Keith failed to show that his assumption provided good cause here.

After reviewing the evidence both supporting and contradicting the Board's finding that Rickson was terminated without cause, we find substantial competent evidence supporting the Board's finding that Keith terminated Rickson without cause.

*Did the Board err in finding that Rickson did not voluntarily resign?*

The Board also held that Rickson did not voluntarily resign. It based that conclusion on its finding that Rickson did not stop working on October 2 but only stated his intent to stop working later. Kerns argues that Rickson voluntarily resigned, disqualifying him from a work disability award.

The record shows that Rickson gave his two-weeks' notice of resignation after Keith told him about his co-workers' allegations against him and his intent to supervise him. The Board agreed with Keith's view that Rickson gave two weeks' notice on October 2, 2014, and it found that Rickson was thus telling his employer he intended to leave after two more weeks of employment. Without other factors, we would normally consider that a voluntary resignation. See, e.g., *King v. Wichita Southeast KS Transit*, No. 90,413, 2004 WL 719930, at *2 (Kan. App. 2004) (unpublished opinion) (finding voluntary resignation where claimant gave two-weeks' notice of his intent to move to another city).

But when Rickson gave his two-weeks' notice, Keith did not accept his proposal. Rather, he told Rickson to take his things and leave immediately. In doing so, Kerns effectively terminated Rickson's employment two weeks early. Workers compensation

11

cases have not interpreted an employer's rejection of an employee's notice of resignation, so the Board properly turned to unemployment cases for guidance. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 364, 361 P.3d 504, (2015) (noting the Kansas Workers Compensation Act has traditionally been viewed as one unit in an overall system of wage loss protection, along with unemployment compensation, and social security).

The Board found that other states, in the context of unemployment law, view an employer's discharge of a worker before the worker's resignation date as an involuntary separation of employment, citing *Kelley v. Department. of Labor*, 197 Vt. 155, 160, 101 A.3d 895 (2014), and *Porter v. Florida Unemployment Appeals Commission*, 1 So.3d 1101, 1104 (Fla. Dist. Ct. App. 2009). *Porter* summarized the two lines of decisions:

"One line of decisions holds that an employee whose employer terminates her employment prior to the effective date of her resignation has never left work voluntarily and therefore cannot be disqualified from receipt of benefits on that basis, even for the period following the employee's intended date of departure. See *Dillard Dep't Stores, Inc. v. Polinsky*, 247 Neb. 821, 530 N.W.2d 637, 643 (1995); *W. Jordan v. Morrison*, 656 P.2d 445, 446-47 (Utah 1982); *Vieweg v. Gatson*, 209 W.Va. 268, 546 S.E.2d 267, 270-71 (2000); see also *Mauro v. Adm'r, Unemployment Comp. Act*, 19 Conn. Supp. 362, 113 A.2d 866, 866-67 (1954); *Cotright v. F.C. Doyal*, 195 So.2d 176, 179 (La. Ct. App. 1967); *Coleman v. Miss. Employment Sec. Comm'n*, 662 So.2d 626, 628 (Miss. 1995). . . .

"Another line of cases holds that unemployment compensation benefits must be limited to the period between the date of an employee's discharge and the effective date of his resignation. See *Diringer v. Indus. Comm'n of the State of Colo.*, 712 P.2d 1091, 1091-92 (Colo. Ct. App. 1985); *Mason v. Donnelly Club*, 135 Idaho 581, 21 P.3d 903, 908 (2001); *Redline Express, Inc. v. State of Kan. Employment Sec. Bd. of Review*, 27 Kan. App. 2d 1067, 11 P.3d 85, 89 (2000); *Stephen's Nu-Ad, Inc. v. Green*, 168 Mich. App. 219, 423 N.W.2d 625, 627-29 (1988); *Ennis v. Employment Div.*, 37 Or. App. 281, 587 P.2d 102, 103 (1978); *Amado v. Unemployment Comp. Bd. of Review*, 177 Pa. Super. 506, 110 A.2d 807, 808 (1955). Even these cases recognize that discharge before the effective date of a resignation is not a voluntary quit." *Porter*, 1 So. 3d at 1103.

Kansas falls in the second line of cases, as the cite to *Redline Express, Inc. v. State*, 27 Kan. App. 2d 1067, 11 P.3d 85 (2000), above, shows.

Yet the Board's analysis follows the first line of cases from other states, rather than *Redline.* That was legal error. The Board held that Rickson never left work voluntarily so he could not be disqualified from receipt of benefits on that basis, even for the period after his intended date of departure. In its view, the termination had the same legal consequence as if Rickson had never given notice at all. The Board tacitly found Rickson's resignation to be a non-event, superseded by the fact that Keith terminated him. The Board cited *Redline*, but only as "suggesting" that when an employee gives notice of intent to resign, the separation of that worker's employment is not voluntary until the effective date of the resignation.

*Redline*, however, is more instructive than that. First, *Redline* recognized the two lines of cases, and rejected the one the Board relied on here.

> "In some instances, other states have given a liberal interpretation to the unemployment compensation statutes and have held that an employee who gives notice is entitled to unemployment benefits beyond the notice period if that employee is terminated. The Nebraska Supreme Court applied that philosophy to the case of *Dillard Dept. Stores, Inc. v. Polinsky,* 247 Neb. 821, 530 N.W.2d 637 (1995). We do not agree with the reasoning of the Nebraska court. Our decision is in line with that of the State of Colorado in *Diringer v. Industrial Com'n,* 712 P.2d 1091 (Colo. App.1985)." *Redline*, 27 Kan. App. 2d at 1071.

Second, the fact pattern in *Redline* is the same as the one here. In *Redline,* as here, the employee gave two weeks' notice of resignation stating the date for his last day of work, yet he was terminated before that last day and was not paid to the date of his stated resignation. *Redline* held that under those circumstances, the employee is entitled to

unemployment compensation only from the date of termination to the date of resignation stated in his notice and not after:

> "We hold that when an employee gives a written notice of resignation indicating his or her last day of work will be a day certain and is then terminated prior to the last day of work stated in his or her notice and is not paid for the period beginning with his termination and ending the date of his or her stated resignation, that employee is entitled to unemployment compensation from the date of termination to the date of resignation stated in his notice *and not thereafter." Redline*, 27 Kan. App. 2d at 1071-72. (Emphasis added.)

The *Redline* panel found that "'[t]he purpose of our employment security law is to prevent economic insecurity resulting from *involuntary* unemployment.'" *Redline*, 27 Kan. App. 2d at 1070, quoting *Palmer News, Inc. v. Kansas Employment Security Board of Review*, 24 Kan. App. 2d 655, 657, 951 P.2d 546 (1997). But that purpose is not served by awarding benefits after an employee's voluntary resignation from the job:

> "In this case, Pattison suffered no economic harm after the effective date of his resignation. From December 25, 1998, and on, Pattison was not harmed as a result of being terminated from his position. By awarding him unemployment benefits from the date of his termination to the date of his future resignation, the trial court effectively compensated Pattison for any economic harm suffered. Any economic insecurity after December 24, 1998, was a result of his voluntary resignation and not his involuntary termination. The trial court's decision is in accordance with the purpose of the employment security law. We see no rationale or logic in concluding that one is entitled to unemployment benefits from or after the date of his or her written voluntary resignation from his or her job." *Redline* 27 Kan. App. 2d at 1071.

The precursor to that rule was established in *Palmer News*. There employee Harrison gave notice of his intent to resign as of August 31, 1995. His employer responded by discharging him on July 26, 1995, but paid Harrison a lump sum equal to the amount of salary he would have earned up to August 31, 1995. Harrison then applied

14

for unemployment benefits but was denied. On appeal, a panel of this court found that because Harrison had received his salary up to the effective date of his voluntary resignation, he had suffered no economic harm from the early removal of his job duties:

> "Kansas courts have not addressed this issue, but the Washington Supreme Court has. In *Safeco Ins. Cos. v. Meyering,* 102 Wash.2d 385, 394, 687 P.2d 195 (1984), the court held that 'when an employee voluntarily submits her resignation and gives notice, if the employer accepts that resignation but pays the employee for the notice period and tells the employee not to show up for the notice period, that job separation is a voluntary quit.' A contrary result, said the court, would be 'inconsistent with the policy of the act that benefits be awarded to those unemployed through no fault of their own.' 102 Wash. 2d at 394.

> "We adopt the reasoning of the Washington court.

> "The purpose of our employment security law is to prevent economic insecurity resulting from *involuntary* unemployment. See K.S.A. 44-702. In the present case, Harrison received salary to the effective date of his voluntary resignation, and he suffered no economic harm from early removal from his job duties. The trial court properly ruled he was ineligible for unemployment benefits." *Palmer News*, 24 Kan. App. 2d at 657.

*Redline* and *Palmer News*, read together, establish that when employees voluntarily give an employer notice of a date certain on which they intend to resign yet are terminated before that date, they are due unemployment benefits up to, but not after, that date. See 27 Kan. App. 2d at 1070-71.

Kerns argues that the same is true in workers compensation cases—because Rickson gave his two-weeks' notice which caused Keith to terminate him immediately, Rickson was entitled to work disability only for the two-week period he would have worked, absent his termination. Rickson had no intent to work after that two-week period so any wage loss after that time was not caused by his injury. See K.S.A. 2019 Supp. 44-

15

510e(a)(2)(E)(i). Although our Kansas workers compensation cases have not addressed this issue, we agree.

Granting an injured employee an award for work disability after a date certain on which the employee has stated an intent to quit disregards the fundamental purpose of a work disability award—to compensate the employee for lost ability to earn wages *caused by the injury*. "[W]ork disability focuses on the reduction in a claimant's *ability* to earn wages, not on the actual wages lost." *Watkins v. Food Barn Stores, Inc.*, 23 Kan. App. 2d 837, 840, 936 P.2d 294 (1997).

When the employee fails to show this required nexus—that wage loss was caused by the injury—the employee cannot recover under this statute. Compare *Merrill*, 2016 WL 3202663, at *8 (finding that the work disability statute "specifically requires a nexus between the claimant's wage loss and his or her injury") with *Stephen v. Phillips County*, 38 Kan. App. 2d 988, Syl. ¶ 2, 174 P.3d 452 (2008) (finding, under pre-amended version of statute, that no provision required a nexus between the wage loss and the injury for recovery of permanent partial general disability awards). The causal connection required in (a)(2)(C) is underscored by the definition of "wage loss" in (a)(2)(E) which explains: "[w]age loss caused by voluntary resignation or termination for cause shall in no way be construed to be caused by the injury." K.S.A. 2019 Supp. 44-510e(a)(2)(E)(i). Here, assuming Rickson's resignation was voluntary, 100% of Rickson's "wage loss" after his stated date of resignation was caused by his resignation, not by his injury, so no work disability may be awarded after October 16, 2014. K.S.A. 2019 Supp. 44-510e(a)(2)(E)(i).

The Board based its finding that Rickson did not voluntarily resign on an improper legal premise—that because Keith terminated Rickson's employment before the effective date of Rickson's resignation, Rickson did not leave work voluntarily so he was not disqualified from benefits after his intended departure date.

16

*The Board did not find Rickson was constructively terminated.*

Kerns argues that the Board essentially adopted a "constructive termination" theory and erred in so doing. If Kerns constructively terminated Rickson, Rickson's resignation would be involuntary. The Board credited the testimony of several employees that Keith had given them "TV time" to discipline them or force them to quit. And Rickson assumed Keith was in essence slowly firing him by telling him he could work only when Keith could watch him. The Board noted that "a resignation may be involuntary even though an employee resigned due to a subjective belief of an impending separation of employment," (citing *Slobodzian v. Kansas Employment Security Bd. of Review*, No. 106,820, 2012 WL 4372982, at *7-9 [Kan. App. 2012] [unpublished opinion]).

But the Board did not go so far as to find *Slobodzian* on point, and its facts are readily distinguishable from those here. Slobodzian was a middle-aged manager who left Pepsi's employment just four months shy of his fortieth anniversary working there. During the 2 years before his termination, Pepsi demoted Slobodzian twice unrelated to his job performance, reduced his bonus pay, reduced his vacation time, and denied him a pay raise. It changed his work schedule so his days off were Monday and Tuesday, rather than the former Saturday and Sunday. In late 2009, Slobodzian's immediate supervisor asked if he would accept a severance package. When he declined, he received a pretextual below-satisfactory annual review rating in February 2010. In setting Slobodzian's review rating, his supervisor criticized him for only having 10 rated incidents when, in fact, he had 20. He was criticized for his retention rate for female employees even though he did not have any female employees and was not involved in the hiring process. The next month, another manager asked Slobodzian if he would be willing to quit and take a severance package. When he again declined, Pepsi brought in the big gun, the region manager, to press the issue. The region manager told Slobodzian

that if he were terminated, the severance package would no longer be available. Seeing the writing on the wall, Slobodzian accepted the offer and quit. 2012 WL 4372982, at *9.

In *Slobodzian*, the Board denied unemployment benefits because it found Slobodzian's resignation was voluntary and without good cause attributable to Pepsi. See K.S.A. 2011 Supp. 44-706(a) (disqualifying an individual from unemployment benefits if he or she "left work voluntarily without good cause attributable to the work or the employer"). Our court reversed, finding Slobodzian was constructively terminated and that the Board's decision lacked substantial evidence. *Slobodzian,* applies the concept of constructive termination to situations in which an employee faces a choice of resignation or termination. 2012 WL 4372982, at *3, 9.

The Board here made no attempt to apply *Slobodzian* to the facts or to apply a constructive termination theory. Instead, the Board disavowed any reliance on a constructive termination theory:

> "To be clear, the Board is not finding Rickson was constructively discharged or not. Moreover, the threat of "TV time" is not especially crucial to our ruling. Rickson could have been wrong about getting fewer hours, but it does not really matter when he wanted to keep working two more weeks and Mr. Kerns immediately fired him without cause. Because Rickson was terminated for a reason or reasons other than for cause, he is eligible for a work disability award."

And the Board's analysis does not reflect that it applied a constructive termination theory—the Board did not, for example, examine the totality of the circumstances to see whether Keith's conduct effectively deprived Rickson of free choice in giving his two weeks' notice. So we disagree with Kern's assertion that the Board essentially adopted a "constructive termination" theory. Yet because the Board did not base its finding that Rickson did not voluntarily resign on any examination of the facts, we find no substantial, competent evidence supporting that conclusion.

18

*We will not find facts for or against constructive termination.*

Rickson takes a different approach, arguing that this court should apply a constructive discharge theory, citing the duress/coercion analysis in *Southeast Kansas Multi-County Health Dep't v. State of Kansas Sec. Bd. of Review*, No. 110,413, 2014 WL 4081990 (Kan. App. 2014) (unpublished opinion). In that case, we agreed that when an employee later challenges the voluntariness of his decision to resign, "the court must determine from the totality of the circumstances whether the employer's conduct effectively deprived the employee of free choice in making the decision to resign." 2014 WL 4081990, at *7. We approved consideration of these factors when an employee is faced with a choice of resignation or termination:

> "(1) whether the employee was given some alternative to resignation;
>
> (2) whether the employee understood the nature of the choice he was given;
>
> (3) whether the employee was given a reasonable time in which to choose; and
>
> (4) whether he was permitted to select the effective date of resignation."

*Multi-County Health Dep't*, 2014 WL 4081990, at *7 (citing *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167, 174 [4th Cir.1988]). Yet those factors are designed for use when an employer essentially gives the employee a choice of resigning or being terminated, such as *Slobodzian* was. See *Weigand v. Kansas Employment Security Bd. of Review*, No. 109,827, 2014 WL 1302635, at *4 (Kan. App. 2014) (unpublished opinion).

Rickson invites us to apply those factors here and find his resignation was involuntary. But even assuming that use of those factors here is appropriate, we find it inappropriate for us to conduct that fact-based inquiry since the Board did not do so. Our role is to review factual findings rather than make them ourselves. *State v. Estrada-Vital*, 302 Kan. 549, 555, 356 P.3d 1058 (2015). So we will send that issue back to the Board

for its consideration of the facts to determine whether Rickson's resignation was voluntary.

We affirm the Board's finding that Rickson was terminated without cause. Yet we reverse the Board's finding that Rickson did not voluntarily resign and remand with directions for the Board to determine, from the totality of the circumstances, whether Rickson's decision to give two weeks' notice of his resignation was voluntary. If so, he can receive only two weeks' work disability.

Affirmed in part, reversed in part, and remanded with directions.